[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 09-13892 & 09-13993
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 15, 2011
JOHN LEY
CLERK

D. C. Docket No. 05-00009-CR-J-25HTS

UNITED STATES OF AMERICA,

                                                        Plaintiff-Appellee,

versus

ROBERT D. SINGLETARY,
PATRICK M. SINGLETARY,

                                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(August 15, 2011)

Before TJOFLAT, ANDERSON  and ALARCON,* Circuit Judges.

_____

*Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

TJOFLAT, Circuit Judge.

Count One of the multi-count indictment in this case—which was returned on December 21, 2005—charged Robert and Patrick Singletary ("the Singletarys"), Peter J. Russo, Clifford R. Shaw, and others (not indicted) with conspiring between 1997 and September 16, 2004, in violation of 18 U.S.C. § 371, to commit three offenses: (1) to defraud a federally insured bank, in violation of 18 U.S.C. § 1344; (2) to make false representations with respect to material facts to the United States Department of Housing and Urban Development ("HUD"), in violation of 18 U.S.C. § 1001; and (3) to defraud purchasers of residential property and mortgage lenders, in violation of 18 U.S.C. § 1343. On October 17, 2006, the Singletarys pled guilty to Count One to the extent that it alleged a conspiracy to commit the § 1001 offense.[1] The evidence underpinning the guilty pleas indicated that the Singletarys, through others, had induced home buyers to make false statements in

---

[1] 18 U.S.C. § 1001(a) provides for criminal penalties for anyone who

in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
(2) makes any materially false, fictitious, or fraudulent statement or representation; or
(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry . . . .

applying for, and obtaining, mortgage loans insured by the Federal Housing Authority (the "FHA") (which is a part of HUD), thus executing the § 1001 aspect of the Count One conspiracy.  A sentencing hearing was held on July 9 and 10, and November 30, 2007.  At the November 30 hearing, the Singletarys announced their intention to withdraw their guilty pleas, and on June 16, 2008, after considering the parties' memoranda on the issue, the district court reinstated their not-guilty pleas and set the case down for trial on October 6, 2008.

On October 7, 2008, following jury selection, the Singletarys pled guilty to Count One to the extent that it alleged a conspiracy to commit the § 1343 offense[2] in addition to the § 1001 offense.  The district court convened sentencing hearings on April 22 and 23 and on July 21, 2009.[3]  At the April 23 hearing, the court sentenced the Singletarys to prison terms[4] and, as part of the sentence for

---

[2]  18. U.S.C. § 1343 provides, in relevant part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation . . . affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[3]  By stipulation of the parties, the transcripts of the sentencing hearings held on July 9 and 10 and November 30, 2007, were made part of the April 22 hearing.

[4]  Pursuant to 18 U.S.C. § 3581(b)(4), the court sentenced Patrick Singletary to a term of 18 months and Robert Singletary to a term of 12 months and one day.  Both sentences included a

3

conspiracy to violate § 1343, entered a preliminary order of forfeiture in the amount of $1 million.[5] At the July 21 hearing, the court, as an additional part of the sentencing packages, ordered the Singletarys to make restitution to "HUD Collections"[6] in the amount of $1 million.[7] On July 28, 2009, the court entered final judgments against the Singletarys, thus concluding their prosecutions.[8]

The Singletarys now appeal their sentences. We dispose in the margin of their challenges to the district court's forfeiture orders and Robert Singletary's claim that the district court erred in calculating his offense level under the United States Sentencing Guidelines.[9] Remaining for decision is the question of whether

---

three-years term of supervised release pursuant to 18 U.S.C. § 3583.

[5] See Fed. R. Crim. P. 32.2(b). In sentencing a person convicted of conspiring to violate 18 U.S.C. § 1343, i.e., engaging in wire fraud "affecting a financial institution," the district court "shall order that the person forfeit to the United States any property constituting, or derived from, proceeds the person obtained . . . as the result of such violation." 18 U.S.C. § 982(a)(2).

[6] HUD Collections, like the FHA, is part of HUD.

[7] The court signed and filed the restitution order on July 22, 2009.

[8] The final judgments included the Singletarys' prison terms and terms of supervised release; the forfeiture orders were entered pursuant to 21 U.S.C. § 853(a) and 18 U.S.C. § 3554, and the restitution noted in the text was imposed pursuant to 18 U.S.C. § 3556.

[9] The Government concedes that the forfeiture orders were entered in error; hence, on receipt of our mandate, the district court shall delete the forfeiture provision from the Singletarys' judgments. Robert Singletary challenges his prison sentence on the ground that the district court committed clear error in applying U.S.S.G. § 1B1.3(a), because it treated him as having been a member of the conspiracy to the extent that it involved all of the mortgage applications the court found to have been part of the conspiracy. The challenge is meritless, and we therefore affirm his prison sentence without further discussion.

the district court abused its discretion in ordering restitution in the sum of $1 million.

In addressing this question, we begin with a description of the relevant objects of the Count One conspiracy—a scheme to defraud mortgage lenders and the FHA, which insured their mortgages, in violation of 18 U.S.C. §§ 1001 and 1343.[10]  We then proceed to the sentencing hearings before the district court on July 9 and 10, 2007, and April 22 and 23 and July 21, 2009, and examine the proof the Government submitted in support of its demand that the court order the Singletarys to make restitution for the losses the FHA sustained after some of the mortgages it insured went into default and the foreclosure sales failed to bring prices sufficient to satisfy the balances due under the mortgages.  Finally, we determine whether the district court applied the appropriate legal standard in ordering the Singletarys to make restitution in the sum of $1 million.  We conclude that the court did not; therefore, its entry of the restitution orders constituted an abuse of discretion.

I.

The scheme here worked as follows.  CAL Investments of North Florida,

---

[10]  As noted in the text supra, Count One alleged that in addition to defrauding mortgage lenders, the conspirators defrauded purchasers of residential property.  There is no evidence in the record indicating that the home buyers who obtained the FHA insured mortgages were actually defrauded.  If anything, they participated in the fraud.

Inc. ("CAL"), a corporation the Singletarys owned and operated, would purchase residential property in need of substantial repair work to be marketable,[11] and then sell the property to Eagle Investments of North Florida, Inc. ("Eagle"), a corporation Robert Singletary owned.[12] Eagle, in turn, would make the necessary repairs. Eagle obtained the funds needed for the restoration from a commercial bank. The bank would loan Eagle up to 70 percent of the appraised value of the property as restored.[13]

After restoring the property, Eagle would place it on the market. Eagle would refer a potential buyer to one of three mortgage brokerage companies Patrick Singletary owned or controlled: Harbour Mortgage, Sunshine Mortgage, and Tropical Mortgage (collectively the "Mortgage Brokers"). The Mortgage Brokers' loan officers—namely Scott Starratt, T.C. Mullis, Christopher Snell and Robert Hill—would help the potential buyer obtain a mortgage that would be insured by the FHA.[14] The FHA would insure a mortgage for up to approximately

---

[11] Dack Properties of Jax, Inc., which was owned and operated by Patrick Singletary and Clifford R. Shaw, performed the same function as CAL. We refer to them together as CAL.

[12] Other entities, owned by both indicted and unindicted co-conspirators, participated in a manner similar to Eagle. The existence of these entities is immaterial to this appeal.

[13] The appraisal was known as a "subject-to" appraisal. The bank apparently loaned Eagle the funds based on Eagle's creditworthiness and a security interest in the property.

[14] According to the Government, other loan officers were involved. The four named in the text are the only ones identified in the record; they testified for the Government at the sentencing proceedings held on July 9 and 10, 2007.

6

97 percent of the sale price of residential property, provided that the buyer met certain criteria. The criterion pertinent here concerns the buyer's down payment—a minimum of 3 percent of the price the buyer agreed to pay Eagle for the property.

HUD regulations required the buyer, as borrower, to "invest the difference between the total acquisition cost (sales price, cost of any required repairs paid for by the borrower, and total closing costs to be paid by the borrower), and the amount of the mortgage to be insured." This "investment"—the down payment— had to be "not less than 3% of the sales price" for a principal residence.[15] If the buyer received a "gift" for use as the down payment, the gift had to come from, for example, the buyer's "relative" or "employer," and, among other things, "the lender [had to] document the gift funds by obtaining a gift letter, signed by the donor and borrower, that specifie[d] the dollar amount of the gift, state[d] that no repayment [was] required . . . and state[d] the nature of the donor's relationship to the borrower."[16] Finally, "[r]egardless of when the gift funds [were] made available to the homebuyer, the lender [had] to determine that the gift funds ultimately were not provided from an unacceptable source and were indeed the

---

[15] HUD Handbook 4000.2 § 6-2, 2004 WL 5863716 (May 2004).

[16] HUD Handbook 4155.1 § 2-10, 2003 WL 25947965 (Oct. 20, 2003).

7

donor's own funds."[17]

The Mortgage Brokers used various fraudulent practices to obtain FHA insurance. For example, in preparing buyer applications for mortgages (that the FHA would insure), the loan officers at the Mortgage Brokers frequently drafted and signed a gift letter to verify the buyer's source of the down payment. Many of these letters were false in that Eagle, rather than the buyer, provided the down payment. At times, the loan officers would buttress the buyer's creditworthiness with a false "credit explanation" letter or create a false employment verification form.

II.

A.

The presentence investigation reports (the "PSRs") prepared by the probation office for the April 2009 sentencing proceeding stated that the FHA sustained losses totaling $1,732,585 as the result of 89 mortgage foreclosures. These PSRs, like the PSRs prepared for the July 2007 sentencing proceeding, also stated that the FHA had incurred expenses of $1,309,620 in disposing of the 89 foreclosed properties, for a total loss of $3,042,205.[18] The probation office arrived

---

[17] Id.

[18] HUD apparently informed the probation office, as the probation office was preparing the PSRs for the 2007 sentencing proceeding, that 89 foreclosures resulted in FHA losses of $3,042,205. The probation office's $1,732,585 figure purportedly represented the difference

at the $1,732,585 figure in determining, under U.S.S.G. § 2B1.1, the offense level

for a conspiracy to violate 18 U.S.C. §§ 1001 and 1343. See United States

Sentencing Commission Guidelines Manual, § 2B1.1 (Nov. 1, 2008). The specific

offense characteristic of the § 2B1.1(b)(1) guideline, § 2B1.1(b)(1)(I), called for a

16-level enhancement of the base offense level of 6 for a loss of "more than

$1,000,000" but less than $2,500,001.[19] Since $1,732,585 fell between these two

amounts, the PSRs enhanced the Singletarys' base offense levels to level 22.[20]

The Singletarys objected to the PSRs' § 2B1.1(b)(1)(I) loss determination of

$1,732,585 for the 89 foreclosures and the PSRs' recommended restitution of

$3,042,205. Accordingly, when the Singletarys' sentencing proceeding

commenced on April 22, 2009, the Government had the burden of establishing by a

preponderance of the evidence the amount of the FHA's § 2B1.(b)(1) losses, United

States v. Sepulveda, 115 F.3d 882, 890 (11th Cir. 1997) ("When a defendant

---

between the balances due on the 89 mortgages and the amount realized in the foreclosure sales, i.e., the FHA's "actual loss." U.S.S.G. § 2B1.1, comment. (n.3(A)(i)).

[19] If the loss is "more than $2,500,000," U.S.S.G. § 2B1.1(b)(1)(J) provides for a 18-level increase of the base offense level.

[20] The PSR for Patrick further increased his offense level by 4 under U.S.S.G. § 3B1.1(a) (because he was an organizer and leader of the criminal activity), and then reduced it by 2 levels for acceptance of responsibility under U.S.S.G. § 3E1.1(a). This yielded a total offense level of 24 and, with a category I criminal history, a sentencing range of 51 to 63 months. The PSR for Robert reduced his offense level of 22 by 2 levels for acceptance of responsibility under § 3E1.1(a). This yielded a total offense level of 20 and, with a criminal history category of I, a sentencing range of 33 to 41 months. The district court granted downward variances in imposing sentence in both cases.

9

challenges one of the factual bases of his sentence . . . the Government has the burden of establishing the disputed fact by a preponderance of the evidence.") (citation and internal quotation marks omitted), and the amount of restitution the court should order the Singletarys to pay, 18 U.S.C. § 3664(e).[21] See also United States v. McNair, 605 F.3d 1152, 1221 (11th Cir.2010). And whether the court is determining the amount of the § 2B1.1(b)(1) losses or restitution, it "must explain its findings with sufficient clarity to enable this court to adequately perform its function on appellate review." United States v. Huff, 609 F.3d 1240, 1248 (11th Cir. 2010) (citations omitted).

B.

During the sentencing proceeding held on April 22 and 23, 2009, the Government undertook to establish the losses the FHA incurred in the foreclosure of 56 of the 89 mortgages listed in the PSRs.[22] The Government did so through the

---

[21] 18 U.S.C. § 3664(e) states, in pertinent part:

Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.

The Government must demonstrate the amount of such loss with evidence bearing "sufficient indicia of reliability to support its probable accuracy." United States v. Bernardine, 73 F.3d 1078, 1080–81 (11th Cir.1996).

[22] The record does not indicate why the Government chose only 56 of the mortgages to establish the FHA's losses under § 2B1.1(b)(1).

transcripts of the testimony of four of the loan officers employed by one or more of the Mortgage Brokers—Starratt, Mullis, Snell and Hill[23] —given during the sentencing proceeding held on July 9 and 10, 2007. These transcripts disclosed that each of these loan officers was shown the "files" for mortgages he handled to closure. Most of the files contained a gift letter. Each loan officer testified on direct examination that the gift letters in the files he handled were false, in that the signature of the author had been forged or, if not, that the buyer had not received the gift. On cross-examination, the officers wavered. They could not recall some of the closings nor could they say with certainty that the gift letters they identified were false or that the buyer had not received the gift. This led the district court, at the proceeding on April 23, 2009, to question the loan officers' credibility, saying:

> [T]he four employees of this company or these companies . . . had serious credibility problems as far as I am concerned. And I do have serious problems with their testimony regarding their credibility . . . they are unindicted co-conspirators . . . [a]nd I think that affects their credibility. . . . [S]ome of their testimony has to be considered and I did consider some of it.

---

[23] Starratt, Mullis, Snell and Hill were unindicted members of the Count One conspiracy.

11

Record, vol. 2, no. 775, at 4–5.  "I am not specifically finding that the [§ 2B1.1(b)(1)] loss is $1,732,585.52 because basically . . . my calculation of the loss is based on an estimate taking into account the credibility problems that . . . I spoke of earlier."[24]  Id. at 21.  "I am unable to go to 1,732,585."  Id. at 31.

The district court then pegged the loss at $1 million.  The court gave no explanation, however, as to what made up its estimate of $1 million.  The Government's proof related to 56 of the 89 mortgage foreclosures listed in the PSRs, but the court, in estimating the loss at $1 million, did not indicate which of the 56 foreclosures created such loss.  It thus appears that the court merely intuited losses of $1 million for purposes of its § 2B1.1(b)(1) determination[25] and then used that figure in awarding the United States forfeiture.

## C.

The district court deferred its ruling on restitution until July 21, 2009; that day, the court held a hearing to enable the Government to prove its case for

---

[24]  The record does not indicate when, "earlier," the court "spoke of" the officers' questionable credibility, i.e., whether during the July 2007 sentencing proceeding or the April 2009 sentencing proceeding.

[25]  Assuming that the Government's proof established a loss of $1 million, the court, in enhancing the base offense level, should have applied § 2B1.1(b)(1)(H), which provides a 14 level enhancement, instead of § 2B1.1(b)(1)(I), which it did apply, because the loss was not "more" than $1 million.  The Singletarys did not object to the court's § 2B1.1(b)(1)(I) application, however, and although the application could be considered under the plain error doctrine, we would not notice plain error because the Singletarys' substantial rights were not affected.  This is because the court granted a substantial downward variance from the Guidelines sentencing range in fashioning their prison sentences.

restitution pursuant to 18 U.S.C. § 3664(e).  Assistant U.S. Attorney Mark

Devereaux (who had been representing the Government from the beginning) put on

the Government's case.  He called two witnesses.  The first, a HUD official,

explained in a general way how HUD could incur losses over and above differences

between the balance due on defaulted mortgage notes and the price the FHA

obtained through foreclosure sales (which, in the instant case, the PSRs fixed at

$1,732,585 for 89 properties).  But she was not asked, and thus did not state,

whether the losses the FHA incurred in the instant case amounted to the $3,042,205,

the figure HUD had given the probation office prior to the July 2007 sentencing

proceeding and the figure the PSRs recommended the court use in determining the

amount of restitution.  The second witness, an employee of a company that

managed foreclosed properties for HUD, testified about the sort of expenses HUD

generally incurred post-foreclosure and prior to the ultimate disposition of a

foreclosed property.  Like the HUD official, the employee of this company did not

provide the district court with evidence the court could rely on in ordering

restitution.

After presenting the testimony of these witnesses, Devereaux addressed the

district court regarding the amount of restitution the Government thought would be

appropriate.  He stated that the PSRs had "calculated accurately" the loss amount

13

for U.S.S.G. § 2B1.1(b)(1)(I) purposes at $1,732,585, and reminded the court of its previous observation that "there was more than a million dollars for guideline losses" and that it "couldn't figure out for forfeiture exactly what, and the point was just as today it's very difficult." Record, vol. 3, no. 776, at 196–97.[26] Then, treating the testimony of the Government's two witnesses as non-probative, Devereaux effectively abandoned the PSRs' recommendation that the court order $3,042,205 in restitution. Instead, he asked the court to order restitution in the approximate amount of the PSRs' § 2B1.1(b)(1)(I) loss calculation, $1,732,585, stating:

> And this, until you really start looking into it, it looks like it might be fairly easy, but it's very difficult to do. And so I'm asking the Court not to give even the 3 million, give them the benefit. But I'm asking that you give no less than at least the guideline loss that the Court found—I mean, that [the probation office] found, the 3.7—excuse me, 1.7 million, no less than that.

Id. at 197.[27] At this point, the following exchange occurred between the court and Devereaux over the question of whether the court could order restitution using the loss figure determined under § 2B1.1(b)(1) of the Guidelines.

---

[26] As noted in the text supra, the PSRs calculated the losses generated by 89 foreclosures. The Government's case, however, as presented by Devereaux, involved only 56 of the 89 foreclosures. Accordingly, the § 2B1.1(b)(1) losses had to have been considerably less than $1,732,585.

[27] Devereaux was asking the court to grant restitution for the losses the FHA sustained with respect to the 89 foreclosures listed in the PSRs, even though the case he presented for the Government involved only 56 of those foreclosures. See supra note 26.

THE COURT: Let me ask you a question about this.  Now, under the guidelines there is a way to make a reasonably intelligent guess as to the guideline loss.

MR. DEVEREAUX: Yes.

THE COURT: But under this statute relating to restitution, it seems to be all or nothing.  It seems to be—there doesn't seem to be a provision that allows the Court to do that.  It seems to say if you can't do it, then you don't order restitution.  How do you see that statute?

MR. DEVEREAUX:  The bottom line . . . is that my client, HUD, is out $3 million.
. . . .
They intentionally victimized HUD.  They knew that that was the program they wanted to go in.  And, therefore, since they went after HUD, then they have to take [the] victim as they find them.
. . . .
THE COURT: What I'm saying is does the statute give me room to— to do otherwise?

MR. DEVEREAUX: I believe so because it's up to the Court on determining what the restitution is.  And the Court can say, well, I believe under considering all of the factors that the—that the restitution should be modified, it shouldn't be everything . . . .
. . . .
And so no question if you look at that $1.7 million guideline loss, and then you look at that that—here's the profit.  I'm showing the profit is at 2 and a half million. . . . .[T]wo and a half million is what I should be asking here.  But I'm not. I'm trying to be reasonable as well.

Id. at 199–200.[28]  This ended the discussion about whether the district court could

---

[28]  In stating that the Singletarys' fraudulent scheme yielded profits of $2.5 million, Devereaux may have had in mind an alternative method of determining losses under the specific offense characteristic, U.S.S.G. § 2B1.1(b)(1).  The notes to § 2B1.1(b)(1) state: "The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  U.S.S.G. § 2B1.1, comment. (n.3(B)).  In stating that he "should be asking" for restitution of $2.5 million, Devereaux was effectively telling the court

use a "reasonably intelligent guess" to fix the amount of restitution.

On July 22, 2009, the district court entered its order on restitution. The order stated that:

> Upon consideration of the evidence, including the original sentencing hearing held July 9–10, 2007, the sentencing hearing held April 22–23, 2009, the Presentence Investigation Report, and the restitution hearing held July 21, 2009, the Court finds that the Government has failed to establish, by a preponderance of the evidence, restitution in the amount of $3,031,045.00. From the evidence, the Court is unable to determine the exact amount that is recoverable as restitution or is reasonable. As previously indicated, the Court finds that the credibility of the witnesses presented at the original sentencing hearing is questionable. However, the Court does find that restitution of at least $1,000,000.00 has been established by the Government. Accordingly, the amount of restitution is set at $1,000,000.00 jointly and severally.

### III.

### A.

Under the Mandatory Victim Restitution Act (the "MVRA"), restitution is required in any case involving a criminal "offense against property under [Title 18] . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). Wire fraud and fraudulent representations, the objects of the conspiracy in this case, are "offense[s] against property" within the meaning of the MVRA. See Huff, 609 F.3d at 1247. The amount of restitution is not necessarily

---

that if the FHA's losses cannot "reasonably . . . be determined," it should order restitution in the amount of the Singletarys' gain.

16

identical to the amount of loss calculated under the Guidelines.  Huff, 609 F.3d at

1247; see also United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008);

United States v. Simpson, 538 F.3d 459, 465–66 (6th Cir. 2008).  Restitution under

the MVRA is based on the loss the victim actually suffered; whereas the amount of

loss under § 2B1.1(b)(1) of the Guidelines is determined using "the greater of

actual loss or intended loss."[29]  U.S.S.G. § 2B1.1, comment. (n.3(A)).  See Huff,

609 F.3d at 1247–48.

## B.

The Singletarys' challenges to the Government's demand for restitution

were presented initially in their objections to the PSRs prepared for the July 9–10,

2007 sentencing proceeding and then again in response to the district court's

directive to the parties, made at the close of the sentencing proceeding, to file post-

hearing memoranda.  In his memorandum, Patrick Singletary reminded the court

that, with respect to the 89 mortgage foreclosures listed in the PSR, he had

"objected to the factual basis and calculation of losses set out in the [PSR] both for

sentencing guidelines calculations and restitution," Patrick M. Singletary's Mem.

Regarding Sentencing at 1, and that "[b]ecause of these objections, the government

must prove as to each FHA mortgage falling within the conspiracy the specific

---

[29]  It is not clear from the record whether, in determining loss for U.S.S.G. § 2B1.1
purposes, the district court believed that $1 million represented intended loss or actual loss.

false statements and that they are material," id. at 8. Robert Singletary's memorandum likewise put the Government to the proof with respect to the alleged false statements and the losses those mortgages generated.

C.

During the July 9–10 proceeding, the Government did not attempt to prove that the buyer's applications for the 89 mortgages listed in the PSRs contained materially false statements;[30] rather, as recounted in part II, supra, the Government limited its proof to the applications of 56 of those mortgages. To this end, it presented the testimony of four of the Mortgage Brokers' loan officers, Starratt, Mullis, Snell and Hill. As the loan officers took the stand, Devereaux handed them the FHA files, one by one, that they handled and asked them whether the files contained anything fraudulent. For example, Devereaux asked the first witness, Starratt, "is that file clean and legit?" Starratt answered, "No, it has another fake gift letter in it." Record, vol. 1, no. 553, at 114. Robert Singletary's attorney, Curtis Fallgatter, objected on the ground that the statement amounted to nothing more than a conclusion. Starratt interjecting, stated, "[w]ell, it's filled out in my handwriting," implying that because he filled it out it was fake. The district court overruled the objection with this comment: "I'm not so sure I disagree with you

---

[30] Most of the allegedly false statements were made in gift letters. Some were made in "credit explanation" letters or employment verification forms. See supra part I.

that there may be a problem with these generalizations that something is fake. And I also have a problem with the fact that he filled it out making it fake. That doesn't make it fake." Id. at 114–115. Devereaux, referring to the same file, then asked Starratt, "no question in your mind there's fraud in that file?" Fallgatter objected to the question as leading. The court, without ruling, said this: "Like I told you, these general answers that there's a fraud in the file ain't going to get it with me." Id. at 119.

Devereaux questioned Mullis, Snell and Hill in much the same manner, with Fallgatter and Charles Lembke, Partrick Singletary's attorney, objecting intermittently to what they considered "generic" testimony about the documents they identified as fraudulent. Such generic and conclusory direct-examination testimony about fraud delivered by four unindicted co-conspirators who executed the fraud presented "serious credibility problems" for the district court, as it stated during the April 23, 2009 hearing.

On July 21, 2009, the Government had further opportunity to buttress its case—that the applications for the 56 foreclosed mortgages were fraudulent, resulting in FHA losses of $1,732,585 and additional HUD losses of $1,309,620, for a total of $3,042,205.[31] The Government's effort failed, however, which

---

[31] Apparently, Devereaux was attempting to hold the Singletarys responsible for the $1,732,585 in losses incurred with respect to the 89 mortgages listed in the PSRs, not the 56

19

accounts for this statement in the district court's July 22, 2009 restitution order: "The Government has failed to establish, by a preponderance of the evidence, restitution in the amount of $3,0[42,20]5." That is, not only did the Government fail to establish the additional HUD losses of $1,309,620, but the FHA losses of $1,732.585 as well. Assuming that the FHA losses incurred by the foreclosure of the 89 mortgages listed in the PSRs were caused by fraud and were precisely in the amounts the PSRs indicated, the FHA losses for the 56 mortgages included within the 89 mortgages totaled $1,164,377. Devereaux never argued that the court should order forfeiture for that amount, though, and the court apparently eschewed adding up the numbers on its own initiative, as the following statement in its July 22 restitution order indicates: "From the evidence, the Court is unable to determine the exact amount that is recoverable as restitution or is reasonable."

We assume that, in saying this, the district court meant that it could not say that the Government had made out a case for restitution under 18 U.S.C. § 3664(e). To order restitution, then, the court would have to accept Devereaux's "I believe so" answer to the question it put to Devereaux the day before, on July 21: whether it could adopt—for the restitution figure—the "reasonably intelligent guess" it had made in determining the FHA's loss under the Guidelines, specifically,

_____

mortgages he presented to the four loan officers, Starratt, Mullis, Snell and Hill.

20

§ 2B1.1(b)(1). The court accepted Devereaux's answer and accordingly adopted its § 2B1.1(b)(1) guess and ordered restitution in the sum of $1 million.

IV.

The Government had the burden of proving, with respect to each of the mortgages for which it sought restitution, that the mortgage was the product of a fraudulent misrepresentation. The district court's statement in the July 22 restitution order that "restitution of at least $1,000,000 has been established by the Government" did not identify the mortgages that had been fraudulently obtained and caused losses totaling that sum.

To enable meaningful appellate review, a district court's calculation of restitution must be supported by specific factual findings. Huff, 609 F.3d at 1248. In the context of the case here, the district court's task was, first, to determine by a preponderance of the evidence which of the 56 mortgages the loan officers handled was obtained through a false "gift" letter, a false "credit explanation" letter or a false employment verification form, and, second, where fraud is found, to determine the extent of the actual loss HUD may have incurred due to the mortgage's foreclosure.

The district court failed to carry out this task. We therefore VACATE the restitution provisions of the Singletarys' judgements and REMAND the case so

that the court may perform this task.  We do so with this caveat: the Government is not receiving another bite of the apple.  The district court shall render the necessary findings of fact and conclusions of law with respect to each of the 56 mortgages at issue on the basis of the evidentiary record as it now exists.

SO ORDERED.