**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 18-11402

United States Court of Appeals
Fifth Circuit

**FILED**

October 13, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

KELLY ROBINETT; KINGSLEY NWANGUMA; JOY OGWUEGBU,

Defendants–Appellants.

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CR-559-5
USDC No. 3:15-CR-559-3
USDC No. 3:15-CR-559-4

Before OWEN, Chief Judge, and BARKSDALE and DUNCAN, Circuit Judges.

PER CURIAM:*

Dr. Kelly Robinett, Kingsley Nwanguma, and Joy Ogwuegbu were convicted by a jury of conspiracy to commit health care fraud, health care fraud and aiding and abetting, which are offenses under 18 U.S.C. §§ 2, 1347, and 1349. The defendants raise numerous issues, including challenges to the sufficiency of the evidence and to aspects of their respective sentences. We

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-11402

affirm the district court's judgment in part. We vacate and remand Nwanguma's and Ogwuegbu's sentences for reformation as discussed in parts III(G) and IV(C).

I

Two home health care companies were alleged to have been involved in fraudulent conduct: Boomer House Calls (Boomer HC) and Timely Home Health (Timely HH). Dr. Kelly Robinett owned the majority of the shares of Boomer HC. Kingsley Nwanguma, a licensed vocational nurse (LVN), worked for Timely HH. Joy Ogwuegbu served as Timely HH's head of nursing. Other individuals relevant to the current appeal include: Usani Ewah and Patience Okoroji, Timely HH's owners; Dr. Claudio, a physician associated with Timely HH; and Shawn Chamberlain, a physician's assistant who was operating under Robinett's supervision and who owned the remaining interest in Boomer HC. Timely HH and Boomer HC billed Medicare for home health care services. The home health care process typically begins when "a patient's primary care physician . . . refers [him or] her for home health services."[1] The physician can issue such a referral by phoning the home health care agency and ordering a home health care assessment. After receiving the order, the agency sends a written confirmation for the physician's signature. A nurse or physician's assistant then (1) visits the patient, (2) completes an Outcome and Assessment Information Set (OASIS) to determine whether the patient is homebound, and (3) drafts a plan of care, or Form 485.[2] A physician then signs the Form 485, certifying that the patient is "homebound, under [the] doctor's care, and in need of skilled services."[3] The process results in payment for one sixty-day episode of care, during which an LVN provides skilled nursing care to the patient. The

---

[1] *United States v. Ganji*, 880 F.3d 760, 764 (5th Cir. 2018).
[2] *See id.*
[3] *Id.* at 777 (internal quotation marks omitted).

2

No. 18-11402

patient can then be recertified for additional episodes if necessary. Under this framework, Timely HH would bill Medicare for home health treatment under Part A Medicare coverage. Boomer HC would bill Medicare for completing home health certifications under Part A and under Part B for physician visits.

Government investigators received a tip that Timely HH was engaged in fraudulent conduct. A subsequent investigation confirmed the government's suspicions and revealed misconduct at Boomer HC as well. Robinett, Nwanguma, and Ogwuegbu were indicted, and the case proceeded to trial.

The jury convicted Robinett and Nwanguma of conspiracy and substantive health care fraud. Ogwuegbu was acquitted of conspiracy but found guilty of substantive health care fraud. This appeal followed.

## II

Each defendant raises separate arguments on appeal. We first address the issues presented by Robinett.

## A

Robinett asserts there was insufficient evidence of conspiracy to commit health care fraud and substantive health care fraud. Our inquiry requires us to consider whether, "viewing the evidence and reasonable inferences in light most favorable to the verdict, [a] rational jury 'could have found the essential elements of [each] offense to be satisfied beyond a reasonable doubt.'"[4]

To convict Robinett of conspiracy, the prosecution needed to prove beyond a reasonable doubt that: "(1) two or more persons made an agreement to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement . . . with the intent to further the unlawful purpose."[5] Robinett alleges there was

---

[4] *Id.* at 767 (quoting *United States v. Bowen*, 818 F.3d 179, 186 (5th Cir. 2016)).
[5] *Id.* (quoting *United States v. Eghobor*, 812 F.3d 352, 362 (5th Cir. 2015)).

insufficient evidence of an agreement to engage in fraud, and insufficient evidence he knew the unlawful purpose of the agreement.

In presenting its case against Robinett, the government relied heavily on the testimony of Shawn Chamberlain, a physician's assistant who owned a 49% interest in Boomer HC. Chamberlain could not own a majority interest in the company under Texas law because he was not a physician. He originally teamed with Dr. Olusola to operate Boomer HC. Olusola owned 51% of Boomer HC, and after Olusola left the company, Chamberlain recruited Robinett to become the 51% owner. Chamberlain filled out Boomer HC's Medicaid enrollment form in Robinett's name. The form included an assignment of benefits to Chamberlain. Robinett signed the form. Chamberlain paid Robinette in alternating amounts, $2,000 every other month and $1,500 in the other months. Chamberlain testified that he would meet with Robinett periodically to exchange Form 485s and telephone orders. Robinett would sign the documents and return them to Chamberlain. Chamberlain testified that Robinett knew he was signing fraudulent documents. Robinett and Chamberlain met once or twice a week in a parking lot where Chamberlain would give Robinett Form 485s to sign. Robinett never saw patients, he never saw their OASIS forms or health charts, and he never declined to sign a home health care certification. At one point, Robinett spent a month in rehabilitation for alcohol abuse. During that time, Chamberlain met Robinett outside the facility and handed him stacks of patient certifications to sign. Robinett did not have access to patients' charts during this time. Chamberlain testified that "[Robinett] knew it was a fraud. He knew what he was signing. He knew he wasn't reading it. And he knew that [Boomer HC] billed for it." This testimony establishes each element of a conspiracy to defraud Medicare to the requisite standard.

No. 18-11402

Likewise, there was sufficient evidence to convict on Counts 4, 5, and 6, the substantive health care fraud charges concerning patients B.H., L.S., and S.S., respectively.[6]  Each substantive offense was the "foreseeable" outgrowth of having engaged in a conspiracy to defraud Medicare.[7]  Under the *Pinkerton* doctrine, "the jury was entitled to convict [him] on the substantive counts as well."[8]

## B

We next consider if the district court erred when it refused to sever Robinett's trial from the remaining co-defendants' pursuant to Rule 14 of the Federal Rules of Criminal Procedure.  Rule 14 provides that "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."[9]  However, generally, "persons indicted together should be tried together, especially in conspiracy cases."[10]

We review the denial of Robinett's Rule 14 motion "only for abuse of discretion."[11]  On appeal, Robinett argues severance was appropriate because of the significant risk of prejudicial spillover.  He asserts his motion should have been granted because his temporal involvement in the conspiracy was comparatively narrower than the remaining defendants and because evidence

---

[6] *See id.* at 777 (noting that "[t]o prove health care fraud, in violation of 18 U.S.C. § 1347, the [g]overnment must show that the defendant knowingly and willfully executed 'a scheme or artifice—(1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises,' any health care benefit program's money in connection with the delivery of or payment for health care services" (quoting 18 U.S.C. § 1347(a))).

[7] *United States v. Barson*, 845 F.3d 159, 165 (5th Cir. 2016).

[8] *Id.*

[9] FED. R. CRIM. P. 14(a).

[10] *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993).

[11] *Id.*

that others falsified records was irrelevant to the central question in his case, namely whether he *knew* the records were false.

First, Robinett exaggerates the spillover risk here. He may have only participated in the final few years of the conspiracy. But that fact alone is insufficient to rebut the presumption of joint trials in conspiracy cases.[12] The government also convincingly argues that evidence suggesting others falsified records would have been admissible were Robinett tried separately. Even if Robinett's trial turned on whether he *knew* the records were false, the government would still have had to prove that the records were falsified in order to prove that Robinett knew (or was deliberately ignorant) of their falsity. Likewise, the existence of facially falsified documents was probative of Robinett's knowledge and intent to defraud. Second, the judge's instruction that each count, and the evidence pertaining to it, should be considered separately was sufficient to alleviate the risk of unfair prejudice in this case.[13] The district court did not abuse its discretion by trying Robinett with his co-defendants.[14]

## C

Robinett contends the district court abused its discretion in giving a deliberate ignorance instruction to the jury.[15] Robinett argues there was insufficient evidence that he "was subjectively aware of a high probability of the existence of the illegal conduct" or that he "purposely contrived to avoid learning of the illegal conduct," both of which are required for the trial court to

---

[12] *See id.*

[13] *See United States v. Whitfield*, 590 F.3d 325, 356 (5th Cir. 2009) (noting that this type of instruction is "generally sufficient to prevent the threat of prejudice resulting from unsevered trials" (internal quotation marks omitted) (quoting *United States v. Massey*, 827 F.2d 995, 1005 (5th Cir. 1987))).

[14] *See id.* at 355-56 (citing *United States v. Tarango*, 396 F.3d 666, 673 (5th Cir. 2005)).

[15] *See United States v. Brooks*, 681 F.3d 678, 697, 701 (5th Cir. 2012).

No. 18-11402

issue the instruction.[16]

The evidence demonstrated that Robinett was aware of fraud in the home health care industry but (1) failed to read home health certifications before signing them; (2) signed telephone orders appearing to originate with him but in fact originating with Timely HH; and (3) owned a controlling share in Boomer HC but did not have access to the entity's bank account and appeared unaware of how much Boomer HC billed Medicare. As one government witness stated, Robinett engaged in such conduct because it was "easy money." The finder of fact could rationally infer from this evidence that Robinett "was subjectively aware of a high probability of the existence of the illegal conduct" and that he "purposely contrived to avoid learning of the illegal conduct."[17] Instructing the jury regarding deliberate ignorance was not error.

## D

Robinett was ordered to pay $1,435,608.16 in restitution. He argues that the district court (1) erroneously double-counted certain Medicare billings, increasing the restitution amount by $52,201.59; and (2) should not have relied on the presentence investigation report (PSR) to calculate the amount of restitution because the PSR did not identify the seventy-eight unique beneficiaries whose Medicare billings formed the basis of the restitution order.

Robinett's double-counting argument is based on a misreading of the PSR. The PSR contained a chart outlining the amount each health care agency billed Medicare, the amount each agency received from Medicare, and the number of unique beneficiaries impacted as a result of Robinett's conduct at each agency. The cumulative amount Medicare paid was $1,435,608.16, the amount of restitution Robinett was ordered to pay. The total number of unique

---

[16] *Id.* at 701 (quoting *United States v. Lara–Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990)).

[17] *Id.* (quoting *Lara–Velasquez*, 919 F.2d at 951).

beneficiaries at each of the relevant agencies was seventy-eight. The PSR noted that "to avoid double-counting," the unique beneficiaries associated with Boomer HC's billings were not included in the overall unique-beneficiaries total because these patients were already accounted for in Timely HH's corresponding entry. The chart did include an entry of $52,201.59 for the amount Medicare paid Boomer HC. That amount, when added to the amounts Medicare paid to the remaining agencies, results in a restitution amount of $1,435,608.16.

On appeal, Robinett argues that if Boomer HC's beneficiaries could not be counted, neither could the amount Medicare paid out for those beneficiaries. But he is mistaken. The two corresponding entries in the PSR outlining the total number of unique beneficiaries impacted by the fraud and the total amount Medicare paid out to each agency inform different sentencing factors. The unique-beneficiaries entry informs the number of victims, which can result in a sentencing enhancement under the Sentencing Guidelines.[18]  Double-counting *unique* beneficiaries would constitute error, which is why the PSR in this case refused to count Boomer HC's beneficiaries at all. In contrast, because Medicare paid each company based on that company's billings, the PSR correctly concluded that it could count Boomer HC's billings even if some of its patients overlapped with Timely HH's. If one patient is treated by two different agencies and both agencies bill Medicare, the government would pay both claims. Thus, the district court did not erroneously double count certain Medicare payments when determining Robinett's restitution amount.

Robinett's second argument—that the court erred in relying on the PSR because the PSR did not identify which billings belonged to each of the seventy-eight unique beneficiaries—is also unavailing. He argues that the PSR is

---

[18] *See United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016).

entirely conclusory and insufficient to support the restitution order. But the fact that the PSR did not identify individual beneficiaries or set forth the restitution amount per beneficiary does not render the document conclusory. The PSR more than adequately justified the restitution amount. It (1) limited the billings to those Robinett himself certified; (2) limited the billings to germane periods at each agency; and (3) set forth the amounts billed by and paid to each agency. The district court was entitled to rely on the PSR's calculations.[19]

## III

### A

Nwanguma alleges there was insufficient evidence to convict him of conspiracy to commit health care fraud and substantive health care fraud. The record reflects otherwise.

Nwanguma, a vocational nurse, recruited patients for Timely HH and was paid from $350 to $500 for each patient. He knew some were not homebound. For example, H.L. walked two miles each day and cooked his own meals. W.L cleaned the house, mowed the lawn, and cooked his meals. Nwanguma falsified notes. He knew that he was not providing skilled nursing to his patients, testifying that he checked only their weight and temperature, and that he watched television the rest of the time. He knew that Timely HH was billing Medicare for services that he did not provide. He admitted that he spent only about fifteen minutes with each patient but that Okoroji told him to say he spent forty-five minutes with them in order to bill Medicare more. Nwanguma acknowledged receiving a pay raise from his employer in exchange

---

[19] *See United States v. Nava*, 624 F.3d 226, 231 (5th Cir. 2010) (noting that "[a] presentence report 'generally bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations'" (quoting *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007))).

No. 18-11402

for doing "whatever [Okoroji] told him to do." There was considerable evidence supporting the jury's finding that Nwanguma entered into an agreement to defraud Medicare. Under the *Pinkerton* doctrine, the jury was likewise justified in convicting Nwanguma of each substantive offense.[20]

**B**

Nwanguma asserts that the district court should have granted him a new trial because of the admission of testimonial statements without cross-examination.[21] During Nwanguma's trial, Nwanguma's counsel stipulated to the admissibility of several exhibits, including Claudio's and Okoroji's factual resumes. Both resumes identified Nwanguma as a fellow co-conspirator. Okoroji's factual resume also noted that "Ewah and others paid recruiters, including [Nwanguma,] to recruit beneficiaries for home health services regardless of whether the beneficiaries needed home health care." Neither witness testified. After presenting its case, the government sought to withdraw Okoroji's factual resume from evidence, but Nwanguma's counsel objected. The court allowed the exhibits to remain in evidence. The government did not seek to withdraw Claudio's factual resume. Nwanguma relied on both documents during closing arguments.

On appeal, Nwanguma argues the admission of both factual resumes constituted error. Turning first to the admission of Okoroji's factual resume, Nwanguma waived his right to confront Okoroji. As articulated in *United States v. Olano*, "waiver is the 'intentional relinquishment or abandonment of a known right.'"[22] Here, the exhibit, which had yet to be published to the jury

---

[20] *Barson*, 845 F.3d at 165.

[21] *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) (noting that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands [either cross-examination or] what the common law required: unavailability and a prior opportunity for cross-examination").

[22] 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

prior to the government's request to withdraw it from evidence, made its way to the jury because Nwanguma objected to its withdrawal. At that point, Okoroji's factual resume became, for all intents and purposes, a defense exhibit. Nwanguma cannot now complain about the admission of this evidence when he argued at trial that this evidence should be admitted.[23]

Nor did the admission of Claudio's factual resume constitute error. Nwanguma concedes that he did not object to the alleged constitutional violation at trial. His contentions are subject to plain error review on appeal.[24] Under that standard, Nwanguma must show a plain error affecting his substantial rights and seriously affecting the fairness, integrity, or public reputation of judicial proceedings.[25] The incriminating language in Claudio's factual resume parallels that which was found in both Ewah's and Okoroji's factual resumes. Because both Ewah's and Okoroji's factual resumes were properly admitted into evidence, the most that can be said about Claudio's factual resume is that it reinforced the other two exhibits. As a result, the admission of Claudio's factual resume did not constitute the requisite plain error, did not affect Nwanguma's substantial rights, and did not "seriously affect[] the fairness, integrity or public reputation of judicial proceedings."[26]

## C

For the first time on appeal, Nwanguma contends he received ineffective assistance of counsel "when counsel agreed to the admission of Claudio's,

---

[23] *See United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995) (noting that "[w]aived errors are entirely unreviewable"); *see also United States v. Reveles*, 190 F.3d 678, 683 (5th Cir. 1999) (noting that "[w]hen a defendant has waived a right, the district court cannot be said to have erred by failing to override the intentions of the defendant's counsel by asserting the right *sua sponte*"), *abrogated on other grounds by United States v. Vargas–Ocampo*, 747 F.3d 299 (5th Cir. 2014) (en banc).

[24] *United States v. Dickerson*, 909 F.3d 118, 126 (5th Cir. 2018) (citing *United States v. Medina–Anicacio*, 325 F.3d 638, 643 (5th Cir. 2003)).

[25] *See id.*

[26] *Id.* (citing *United States v. Garza*, 429 F.3d 165, 169 (5th Cir. 2005)).

No. 18-11402

Ewah's, and Okoroji's factual resumes and the information against Chamberlain without requesting that each document be redacted to omit Nwanguma's name. But as Nwanguma acknowledges, courts of appeals will rarely consider ineffective assistance of counsel claims on direct appeal if the claim was not "adequately raised in the district court."[27] We agree with the government that the record is insufficiently developed to address Nwanguma's claims. The record does not reflect what alternative strategies were available to counsel, nor has counsel had the opportunity to explain her motivation for her decision.[28] We therefore decline to review Nwanguma's ineffective assistance claim on direct appeal.

**D**

Nwanguma contends the district court procedurally erred during sentencing when it applied a two-level enhancement for abuse of a position of trust pursuant to section 3B1.3 of the U.S. Sentencing Guidelines Manual (2016).[29] That section states that it applies "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."[30] A position of private trust "refers to a position . . . characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference)."[31] As outlined in the Guidelines' commentary, "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are

---

[27] *United States v. Rivas*, 157 F.3d 364, 369 (5th Cir. 1998).

[28] *See United States v. Garcia*, 567 F.3d 721, 729 (5th Cir. 2009).

[29] *See* U.S. SENTENCING GUIDELINES MANUAL § 3B1.3 (U.S. SENTENCING COMM'N 2016).

[30] *Id.*

[31] *Id.* cmt. n.1.

12

primarily non-discretionary in nature."[32]

On appeal, Nwanguma relies on the two-part test articulated in *United States v. Ollison* to argue that (1) he neither held a position of trust nor (2) "used that position to facilitate or conceal" health care fraud.[33] Whether this enhancement applies "is a sophisticated factual determination reviewed under the clearly erroneous standard."[34] As the government notes, Nwanguma (1) visited with patients, (2) was responsible for reporting back to his supervisors if a patient no longer required home health services, and (3) was required to document his visits with patients. Nwanguma abused his largely autonomous position when he (i) falsified nursing notes, (ii) failed to provide skilled nursing services to his patients, and (iii) regularly met with patients who did not qualify for home health care. The district court's conclusion that the enhancement applies in this case is not clearly erroneous.[35]

**E**

Nwanguma argues the district court erred when it ordered that restitution payments begin immediately. He cites *United States v. Bolton* and *United States v. Westbrooks*, which held that, for Title 26 offenses, restitution is only permissible as a condition of supervised release, not as part of the defendant's sentence.[36] But as the government notes, Nwanguma was convicted of offenses outlined in Title 18. His restitution order, unlike the defendants' in *Bolton* and *Westbrooks*, was made pursuant to the Mandatory

---

[32] *Id.*

[33] *United States v. Ollison*, 555 F.3d 152, 165 (5th Cir. 2009) (quoting *United States v. Reccko*, 151 F.3d 29, 31 (1st Cir. 1998)).

[34] *Id.* at 164 (quoting *United States v. Fisher*, 7 F.3d 69, 70-71 (5th Cir. 1993)).

[35] *See United States v. Miller*, 607 F.3d 144, 148 (5th Cir. 2010).

[36] *United States v. Bolton*, 908 F.3d 75, 98 (5th Cir. 2018); *United States v. Westbrooks*, 858 F.3d 317, 328-29 (5th Cir. 2017), *cert. granted, judgment vacated on other grounds*, 138 S. Ct. 1323 (2018).

No. 18-11402

Victims Restitution Act of 1996 (MVRA).[37]    Nwanguma's reliance on *Westbrooks* is therefore misplaced.    Moreover, pursuant to 18 U.S.C. § 3572(d)(1), "[a] person sentenced to pay a fine or other monetary penalty, including restitution, shall make such payment *immediately*, unless, in the interest of justice, the court provides for payment on a date certain or in installments."[38]  The district court did not err when it ordered Nwanguma to begin making restitution payments immediately.

## F

Nwanguma raises two arguments in support of his position that the district court did not adequately explain its loss calculation for sentencing and restitution purposes.  The first concerns the district court's application of an $80 credit during sentencing.  Nearing the end of sentencing, the district court stated the following:  "And just because of the credit amount, I overstated the [loss] amount.  It's to be $3,120,909.46.  I said 989."  For the first time on appeal, Nwanguma argues that the district court erred insofar as it did not explain the origin of this "credit amount" and why the "credit amount" was only $80.

In response, the government attempts to explain away the $80 credit. The government acknowledged in its response to the PSR that Nwanguma "was entitled to 'a credit for legitimate heath care services' provided to B.H. from May 2008 through November 2008."  The government therefore argued for a $5,586.62 credit.  The government's sentencing exhibits, however, noted that Nwanguma was actually entitled only to a $5,506.62 credit, $80 less than the government's original calculation.  The government opines that "[t]he

---

[37] *See* 18 U.S.C. § 3663A.

[38] 18 U.S.C. § 3572(d)(1) (emphasis added); *see also United States v. Wykoff*, 839 F.3d 581, 582 (7th Cir. 2016) (noting that "[if a defendant's] restitution debt exceeds [his or her] wealth, then the [MVRA] demands that this wealth be handed over immediately" (quoting *United States v. Sawyer*, 521 F.3d 792, 795 (7th Cir. 2008))).

district court appears to have corrected the loss amount in the wrong direction. Instead of adding $80 to the $3,120,989.46 recommended by the PSR, the district court subtracted $80 to obtain a loss of $3,120,909.46." The discrepancy, the government notes, did not affect Nwanguma's Guidelines calculation. Nor has he identified any other credit that he should have but did not receive. Thus, Nwanguma cannot establish the requisite plain error that affects his substantial rights.

We decline to vacate and remand Nwanguma's sentence or restitution order based on his arguments concerning the $80 credit. Though the reasons behind the district court's decision to apply an $80 credit are not entirely clear from the record, the government presents a cogent argument as to the origins of the credit. The $80 credit is also in Nwanguma's favor, and he does not point out what, if any, additional credits he is entitled to but did not receive. The presence of the $80 credit does not undermine the district court's ultimate decision to impose $3,120,909.46 in restitution.

Second, Nwanguma argues the district court erred in failing to explain why the loss calculation for sentencing purposes was identical to the restitution order. He relies on *United States v. Singletary*, an Eleventh Circuit case.[39] As aptly stated in *Singletary*, "[t]he amount of restitution is not necessarily identical to the amount of loss calculated under the Guidelines."[40] That is because "[r]estitution under the MVRA is based on the loss the victim actually suffered; whereas the amount of loss under [section] 2B1.1(b)(1) of the Guidelines is determined using 'the greater of actual loss or intended loss.'"[41] According to Nwanguma, neither the district court nor the PSR adequately

---

[39] *See* 649 F.3d 1212 (11th Cir. 2011).

[40] *Id.* at 1220 (citing *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010)).

[41] *Id.* (quoting U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.3(A) (U.S. SENTENCING COMM'N 2008)).

explained why loss for sentencing purposes equaled loss for restitution purposes. But the record makes clear why the calculations were identical. The PSR addendum, which was adopted by the district court, noted that "*actual loss* for restitution and [G]uideline computation purposes [is] $3,120,989.46." Accordingly, contrary to Nwanguma's contentions, the district court adequately explained why loss for both restitution and Guidelines purposes was equivalent.[42]

## G

At the sentencing hearing, the district court orally pronounced that Nwanguma was required to pay restitution jointly and severally with his co-defendants, including Chamberlain. Nwanguma argues the district court's written judgment must be amended because it did not identify Chamberlain by name as jointly and severally liable for the restitution amount. The government agrees, noting that Nwanguma's written restitution order should be remanded for the limited purpose of including Chamberlain as a jointly liable defendant. We therefore vacate and remand the district court's restitution order for appropriate modification.[43]

## H

Nwanguma contends that the district court erred in requiring, as a condition of supervised release, the payment of all outstanding restitution amounts sixty days prior to the termination of supervised release. The PSR does not include this discretionary supervised–release condition. The district

---

[42] *See United States v. Sherbak*, 950 F.2d 1095, 1099 (5th Cir. 1992) (noting that FED. R. CRIM. P. 32 "does not require a catechismic regurgitation of each fact determined and each fact rejected when they are determinable from a PSR that the court has adopted by reference").

[43] *See United States v. Rivas–Estrada*, 906 F.3d 346, 350-51 (5th Cir. 2018) (noting that "if a written judgment clashes with the oral pronouncement, the oral pronouncement controls").

court noted during oral sentencing that Nwanguma was required to comply with "mandatory and special conditions" on supervised release. The court then outlined several of those conditions but did not mention the condition at issue. The condition was included in the court's written "Order Setting Additional Terms of Supervised Release," which Nwanguma signed on the day of sentencing. However, the record does not affirmatively reflect that Nwanguma had that document before or during sentencing. The condition at issue was included in the district court's written judgment. On appeal, Nwanguma argues the district court's judgment should be vacated and remanded because the written judgment conflicts with the court's original oral judgment.

As this court recently explained in *United States v. Diggles*, a district court is required to provide oral notice of its decision to impose discretionary supervised–release conditions outlined in 18 U.S.C. § 3583(d).[44] By contrast, the district court need not orally pronounce those conditions it is required to impose under the statute.[45] The condition at issue here is discretionary.[46] Consequently, the district court was required to provide Nwanguma adequate notice of the condition so that he could object to the condition if he was so inclined.[47]

Whether Nwanguma or his counsel had the district court's written "Order Setting Additional Terms of Supervised Release" is a matter that is within Nwanguma's or his counsel's knowledge. His brief does not assert that neither he nor his counsel was aware of the written order imposing this condition until after the oral sentencing hearing concluded. We will not declare error in these circumstances. The burden was on Nwanguma to show

---

[44] 957 F.3d 551, 559 (5th Cir. 2020) (en banc).
[45] *Id.*
[46] *See* 18 U.S.C. § 3583(d).
[47] *See Diggles*, 957 F.3d at 559.

No. 18-11402

affirmatively that he did not have notice before he has an arguable complaint.[48] He did not do so.

## IV

## A

Joy Ogwuegbu, Timely HH's director of nursing, contends there was insufficient evidence to support her conviction on Counts 2, 3, 5, and 6—the substantive health care fraud counts concerning patients W.L., H.L., L.S., and S.S., respectively. She alleges there was insufficient evidence she *knowingly* defrauded Medicare and insufficient evidence that she aided and abetted others who defrauded Medicare. She directs this court's attention to the fact that she was acquitted of conspiracy to commit health care fraud and notes that it is difficult to conceive how the jury would find that [she] *purposefully* aided the scheme with the intent to defraud Medicare without thereby agreeing to defraud Medicare.

The evidence reflected that Ogwuegbu repeatedly filled out and signed OASIS assessments, Form 485s, telephone orders, and progress forms for W.L. and H.L. despite never meeting these patients, and she knew Medicare was billed for these patients.[49] Similarly, she never visited L.S. or S.S. but repeatedly filled out and signed Form 485s and telephone orders for them. She

---

[48] *See United States v. Bokine*, 523 F.2d 767, 769 (5th Cir. 1975) ("The record does not show whether appellant was present or absent [when the judge considered the jury's note]. His counsel at oral argument admitted that this is true. Notwithstanding this fact, counsel for appellant assumes that appellant was not present and from that posture contends that the communication with the jury by the District Court outside the presence of the defendant was plain error. In so doing, without any showing or proof that appellant was absent from the courtroom, it appears that his counsel has created a hypothetical 'straw man' and has then proceeded to knock him down. We are not called upon to decide hypothetical questions and do not do so in this instance. The burden was upon appellant to show he was absent during the above proceedings before he could have even an arguable complaint.").

[49] *See United States v. Ganji*, 880 F.3d 760, 764 (5th Cir. 2018) (noting that "Medicare implemented a face-to-face requirement [in 2011] to . . . ensure that medical professionals would not order home health care without ever seeing the patient").

admitted to falsifying other documents, and there was evidence from which a reasonable jury could conclude that she was aware of a pervasive culture of fraud at Timely HH.   Finally, several documents Ogwuegbu signed were demonstrably false, further suggesting her actions were fraudulent.   In light of this evidence, the jury could rationally conclude that Ogwuegbu "associate[d] with the criminal activity, participate[d] in it, and act[ed] to help it succeed."[50]

Nor does Ogwuegbu's acquittal as to Count 1 undermine our conclusion. As we noted in *United States v. Fesler*, "[c]onspiracy and aiding and abetting are entirely separate crimes so that acquittal on one does not implicate the remaining charge."[51]   It is thus entirely plausible for the jury to credit the evidence that it heard of Ogwuegbu's health care fraud, thereby finding her guilty as to each substantive count, while simultaneously declining to find her guilty of conspiracy.

**B**

Ogwuegbu argues the district court's restitution order included conduct outside of the temporal scope of the indictment for her offenses of conviction and, alternatively, that the district court's failure to give a reasoned analysis of how it arrived at the amount of restitution does not allow for effective appellate review.   The government agrees that Ogwuegbu's restitution order, which considered conduct occurring between January 2012 and August 2014, should only have considered conduct occurring between November 30, 2012 and December 6, 2013, the relevant dates in the indictment for her offenses of conviction.   As we made clear in *United States v. Mason*, "[a] defendant sentenced under the [MVRA] is only responsible for paying restitution for the

---

[50] *United States v. Delagarza–Villarreal*, 141 F.3d 133, 140 (5th Cir. 1997) (quoting *United States v. Gonzales*, 121 F.3d 928, 936 (5th Cir. 1997)).

[51] 781 F.2d 384, 390 (5th Cir. 1986) (citing *United States v. Swaim*, 757 F.2d 1530, 1536 (5th Cir. 1985)).

conduct underlying the offense for which [she] was convicted."[52]  Moreover, "restitution for the underlying scheme to defraud is limited to the *specific* temporal scope of the indictment."[53]  We thus vacate and remand Ogwuegbu's restitution order with instructions that it only pertain to conduct occurring between the relevant dates set forth in the indictment.  We express no opinion as to Ogwuegbu's alternative argument.

## C

Ogwuegbu contends she should not be required to pay all outstanding restitution payments within sixty days of the termination of supervised release as required by the district court's written judgment.  At the sentencing hearing, the district court orally ordered Ogwuegbu to pay restitution:

> I also order that she make restitution jointly and severally with codefendants Patience Okoroji, Usani Ewah, Kingsley Nwanguma, Kelly Robinett, and Angel Claudio in the amount of $1,392,188.20. That restitution will be payable to the District Clerk's Office in Dallas for this case.
>
> I also order that upon your release you be placed on supervised release for a term of 3 years. While on release you shall comply with the standard conditions contained in this judgment as well as the mandatory and special conditions stated heaven [sic].
>
> \*    \*    \*
>
> You shall . . . make payments on the restitution amount in the rate of at least $50 per month.

The written judgment also ordered restitution:

> The Court orders that defendant shall make restitution, jointly and severally with co-defendants Patience Okoroji (01); Usani Ewah (02); Kingsley Nwanguma (03); Kelly Robinett (05); Angel Claudio (06); and Shawn Chamberlain (Case No.

---

[52] 722 F.3d 691, 693 (5th Cir. 2013) (quoting *United States v. Inman*, 411 F.3d 591, 595 (5th Cir. 2005)).

[53] *Id.* (quoting *Inman*, 411 F.3d at 595).

No. 18-11402

3:16CR00260-L-1), in the amount of $1,392,188.20. Restitution is payable immediately, but non-payment will not be a violation of defendant's conditions of supervised release so long as defendant pays as provided in defendant's conditions of supervised release.

The conditions of supervised release in the written judgment contained this provision with regard to restitution:

> In addition the defendant shall: . . . take notice that, if, upon commencement of the term of supervised release, any part of the $1,392,188.20 restitution ordered by this judgment remains unpaid, the defendant shall make payments on such unpaid amount at the rate of at least $50 per month, the first such payment to be made no later than 60 days after the defendant's release from confinement and another payment to be made on the same day of each month thereafter until the restitution amount is paid in full. Any unpaid balance of the restitution ordered by this judgment shall be paid in full 60 days prior to the termination of the term of supervised release.

Under 18 U.S.C. § 3572(d)(1), the defendant is required to pay the restitution "immediately, unless, in the interest of justice, the court provides for payment on a date certain or in installments. If the court provides for payment in installments, the installments shall be in equal monthly payments over the period provided by the court, unless the court establishes another schedule."[54]  The Sentencing Guidelines set forth a mandatory condition of supervised release pertaining to restitution:

> The defendant shall (A) make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664; and (B) pay the assessment imposed in accordance with 18 U.S.C. § 3013. If there is a court-established payment schedule for making restitution or paying the assessment (*see* 18 U.S.C. § 3572(d)), the defendant shall adhere to the schedule.[55]

---

[54] 18 U.S.C. § 3572(d)(1).
[55] U.S. SENTENCING GUIDELINES MANUAL § 5D1.3(a)(6) (U.S. SENTENCING COMM'N 2016).

No. 18-11402

There is no written supplemental order in the record with regard to the requirement that restitution must be paid at least sixty days prior to the termination of supervised release. The government acknowledges that Ogwuegbu did not receive adequate notice of this discretionary condition. Therefore we vacate and remand Ogwuegbu's sentence with respect to this condition.[56]

\* \* \*

We AFFIRM each conviction but VACATE and REMAND 1) Nwanguma's sentence for the limited purpose of including Chamberlain as a jointly liable defendant, and 2) Ogwuegbu's sentence so that the district court may remove the special condition of supervised release that requires payment of restitution at least sixty days prior to the end of supervised release.

---

[56] *See United States v. Diggles*, 957 F.3d 551, 559 (5th Cir. 2020) (en banc).

22