[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-16272
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 25, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-00059-CR-HL-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TOMMIE HUFF,

Defendant-Appellant,

STEVE DEASON,

Defendant.

_____

Appeals from the United States District Court
for the Middle District of Georgia
_____

(June 25, 2010)

Before EDMONDSON, BARKETT and BALDOCK,[*] Circuit Judges.

_____

[*]Honorable Bobby R. Baldock, United States Circuit Judge for the Tenth Circuit, sitting
by designation.

BARKETT, Circuit Judge:

Tommie Huff was convicted of bribery and conspiracy to commit wire fraud and bribery, in violation of 18 U.S.C. §§ 1341, 1343, 201, for his role in a kickback scheme that involved placing fraudulent supply orders for Robins Air Force Base ("RAFB"). He raises three issues on appeal. First, he argues that there is insufficient evidence to permit a reasonable juror to find that the single conspiracy charged in the indictment existed because the government failed to prove any interdependence between him and his co-defendant Steve Deason. Rather, Huff argues that there were multiple independent "hub and spoke" conspiracies. Huff also challenges his sentence, arguing that the district court erred in calculating the amount of loss and the amount of restitution. He contends that the district court should have considered only the value of the kickbacks Huff received when it calculated both figures instead of the value of the kickbacks received by both Huff and his co-conspirator "S.H."[1]

## I. CONVICTION

Huff contends that insufficient evidence supported his conviction for conspiracy to defraud because the indictment charged a single conspiracy between

---

[1] This opinion will refer to Huff's co-conspirators as "S.H." and "J.H." because of the sealed nature of the district court's records.

Huff and Steve Deason but the government's evidence only supported a finding of of multiple "hub-and-spoke" conspiracies, in which S.H. and J.H. formed the hub and he and Deason formed separate spokes. He argues that because there was no interdependence between himself and Deason, there was no "rim" connecting the individual spokes and thus there were multiple independent conspiracies, not the single one that was charged in the indictment.

The applicable standard of review is whether, viewing the evidence in the light most favorable to the government, a reasonable juror could have found the existence of a single conspiracy beyond a reasonable doubt. United States v. Richardson, 532 F.3d 1279, 1284 (11th Cir. 2008), cert. denied, 129 S. Ct. 950 (Jan. 12, 2009). "In other words, a jury's conclusion that a single conspiracy existed should not be disturbed as long as it is supported by the evidence." Id.

"To determine whether a jury could reasonably have found that [the] evidence established a single conspiracy beyond a reasonable doubt, [this court] must consider: (1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." Id. (emphasis and quotation marks omitted). "The government must establish interdependence amongst the co-conspirators." United States v. Seher, 562 F.3d 1344, 1366 (11th Cir. 2009). This court has explained that:

3

The existence of separate transactions does not have to imply separate conspiracies if the co-conspirators acted in <u>concert</u> to further a common goal. Courts typically define the common goal element as broadly as possible, with "common" being defined as "similar" or "substantially the same." If a defendant's actions facilitated the endeavors of other co-conspirators, or <u>facilitated the venture as a whole</u>, then a single conspiracy is shown. Each co-conspirator thus does not have to be involved in every part of the conspiracy.

<u>Id.</u> (quotations and citations omitted).

A "hub-and-spoke" conspiracy occurs where "a central core of conspirators recruits separate groups of co-conspirators to carry out the various functions of the illegal enterprise." <u>United States v.Chandler</u>, 388 F.3d 796, 807 (11th Cir. 2004) (citing <u>Kotteakos v. United States</u>, 328 U.S. 750, 755 (1946)). "The core conspirators move from spoke to spoke, directing the functions of the conspiracy." <u>Id.</u> Where only one conspirator moves from spoke to spoke, however, the conspiracy is analogous to a "rimless wheel," with nothing connecting the separate spokes into a single conspiracy. <u>Id.</u> "Thus, where the 'spokes' of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes." <u>Id.</u> Where "the various spokes are aware of each other and of their common aim," however, there is a single conspiracy. <u>Seher</u>, 562 F.3d at 1367.

Based upon the record in this case, we believe the government presented

4

sufficient evidence to permit a reasonable juror to conclude that Huff and Deason were involved in a single conspiracy. First, Huff, Deason, J.H., and S.H. shared a common goal and worked in concert to defraud the government for their personal benefit. Huff and Deason abused their position as government credit cardholders by placing fraudulent orders with APC Supply ("APC") and S&G Supply ("S&G"), both of which were owned by S.H. and J.H. All four individuals personally benefitted from the scheme; J.H. and S.H. would receive cash kickbacks and additional orders while Huff and Deason received cash and merchandise kickbacks.

Second, the nature of the underlying fraudulent scheme was substantially similar because both Huff and Deason placed orders to APC or S&G that they knew would not be filled (or would not be filled in full), paid for the orders with government credit cards, and traveled to APC to pick up their share of the fraudulent gain (in the form of cash or items for their personal use) from J.H. and S.H.

Third, the government presented sufficient evidence to permit a finding of Huff and Deason's overlapping participation (i.e. interdependence) because Huff placed orders for items that Deason picked up from APC's offices even though they worked in separate government offices and the items were destined for

5

delivery to RAFB directly. The jury also could have inferred that Huff and Deason were aware of each other's fraudulent arrangements with S.H. and J.H., APC, and S&G because they (1) had a relationship with each other apart from their transactions with S.H. and J.H., as they were good friends and fishing buddies; (2) visited S.H. and J.H., who orchestrated this scheme, together; (3) used their government credit cards to defraud the government for their personal benefit through APC or S&G over the course of the same two-year time period; (4) visited APC during the day and ate lunch there at APC's expense during that same period; and (5) were treated to a hunting trip together at APC's expense (also during that same period), which constituted a bribe for their continued participation in the fraudulent scheme. The evidence presented was sufficient to permit a reasonable juror to infer that Deason and Huff were aware of the scope of the J.H. and S.H.'s scheme to defraud and that each took almost identical actions that not only furthered the scheme as a whole but were interdependent.

Accordingly, the evidence was sufficient to establish a single conspiracy in this case, and there was no material variance between the indictment and the evidence presented at trial.[2]

_____

[2] While Huff relies heavily on Chandler and Kotteakos in support of his argument, these cases are distinguishable from the facts here. In Chandler, this court held that the government failed to prove a single conspiracy where the organizer of the conspiracy recruited individuals to assist him in the conspiracy, but these individuals were unaware of each other and of the overall

## II. SENTENCE

### A.    Offense Level: Calculation of Loss Amount

Huff argues that the district court erred in determining the loss amount attributable to him as $86,938.03.  He argues that the proper amount of loss should be based only on his counts of conviction, and that therefore he should have been held responsible for only $42,068.64— the portion he received as "kickbacks" from S.H., who retained the other half.  Thus, he contends, under United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(1), his base offense level should have been increased by six levels, not eight levels.

This court reviews de novo questions of law arising under the Sentencing Guidelines.  United States v. DeVegter, 439 F.3d 1299, 1303 (11th Cir. 2006).  This court reviews for clear error a district court's factual determinations made at sentencing.  Id.  Because Huff's arguments on appeal focus on whether the district court properly held him liable for kickbacks received by his co-conspirator, Huff raises a legal issue subject to de novo review.  Id.

---

nature of the scheme.  388 F.3d at 806-812.  This court noted that the conspiracy organizer purposefully prevented his co-conspirators from finding out about each other or the nature of the activity that was the object of the conspiracy.  Id. at 806-07.  In Kotteakos, the Supreme Court held that the government failed to prove a single conspiracy where the defendants interacted with the same individual to obtain loans in a fraudulent manner, but otherwise had no relationship and no connection with each other.  328 U.S. at 754-55.

As discussed in greater detail earlier, Huff and Deason, unlike the defendants in Chandler and Kotteakos, interacted with one another and with their co-conspirators S.H. and J.H. together.

For purposes of determining the offense level, under former U.S.S.G. § 2C1.1(b)(2)(A) (2002) (amended 2004), the amount of loss is the greater of "the value of the payment, the benefit received or to be received in return for the payment, or the loss to the government from the offense."  Contrary to Huff's contention, the value of the bribe (i.e. the kickback) is used only when the value of the bribe exceeds the value of the benefit or the value of the benefit cannot be determined because "for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater."  U.S.S.G. § 2C1.1 cmt. background (2002) (amended 2004).  Huff is also liable for: (1) all acts by others that he aided and abetted; and (2) the acts of his co-conspirators that were reasonably foreseeable to him and thus, jointly undertaken criminal activity.  U.S.S.G. § 1B1.3(a)(1)(A) and (B).

Huff's contention that the loss amount is limited to his share of the kickbacks (i.e. his portion of the bribe) is foreclosed by this court's decision in DeVegter, 439 F.3d at 1303.  In DeVegter, one of the two defendants, who worked at an investment banking firm, gave an intermediary $83,872 to use as a bribe in order to obtain a government contract.  Id. at 1302.  The intermediary who received this money, in turn, gave half of it to the other defendant, who helped secure the contract for the investment firm.  Id. at 1302, 1305 n.3.  The district court

8

calculated the loss amount based on the half-portion of the bribe that one of the defendants ultimately received. Id. at 1305 n.3.

On appeal, this court explained that, under U.S.S.G. § 2B4.1, which cross-references § 2C1.1 (the Guideline provision at issue in this case), the loss amount used at sentencing may be based on the amount of the bribe that a defendant received, but only if it was not possible to estimate the net value of the improper benefit garnered by the defendant's fraudulent conduct. Id. at 1305 n.3 Thus, we held that it was inappropriate to use the amount of the bribe as the loss amount, and that the improper benefit to the investment firm should have been used as the loss amount because it could be calculated with reasonable certainty and would have exceeded the amount of the bribe he received. See id. at 1303-05, n.2. This court also clarified that, even if it were appropriate to determine the loss amount based on the bribe, the loss amount should have been equal to the full, initial bribe amount, not just the half-portion of the bribe one of the defendants ultimately received. Id. at 1305 n.3.

The same analysis and result applies here. Huff does not seriously dispute the fact that the amount of his "kickbacks" was less than the amount that APC or S&G benefitted as a result of the illegal scheme. Thus, the bribe amount would not be the proper measure of loss here under § 2C1.1, which requires the imposition of

whichever is <u>greater</u>: the value of gained by the payer of the bribe or the recipient of the bribe. Furthermore, under § 1B1.3, Huff is liable for all acts he aided and abetted (which includes the fraud that S.H. and J.H. perpetrated on the government through APC and S&G) and for the acts of his co-conspirators that were reasonably foreseeable to him (i.e. S.H.'s acts).

Therefore, the district court did not err in basing the loss amount on Huff's substantive counts of conviction only and calculating it as $86,938.03, which was the total amount of the fraudulent checks written by his co-conspirator S.H. ($84,137.28) plus the value of the hunting trip Huff received as a bribe ($2,800.75).[3] Notably, the district court limited its loss calculation to the substantive counts of conviction on the charges of bribery even though it was authorized under § 1B1.3 to include the loss amount attributable to Huff's co-conspirator Deason.

In conclusion, the district court's calculation of $86,938.03 as the loss amount was not clearly erroneous.

---

[3] While the district court's language indicated that the loss amount included the value of the two hunting trips, our review reveals that the district court held Huff responsible for the value of the 2002 hunting trip only. The total amount of $86,938.03 is comprised of the value of the total amount of the checks set forth in Huff's substantive counts of conviction for bribery ($84,137.28) and the value of the 2002 hunting trip ($2,800.75). This calculation is consistent with the district court's decision to hold Huff responsible for only the amounts relating to his substantive counts of conviction because the jury did not convict Huff of bribery relating to the 2001 hunting trip.

**B.** **Restitution Order**

Huff argues that the district court abused its discretion by ordering that he pay restitution in an amount equal to the monetary figure that both he and S.H. received as kickbacks, again contending that he should have been held liable for only half that amount. Specifically, Huff relies on this court's decision in United States v. Vaghela, 169 F.3d 729 (11th Cir. 1999), in support of his argument that he should have been ordered to pay restitution in the amount of $42,068.64 (i.e. the amount of the kickbacks he actually received) rather than $86,938.03 (the loss amount calculated by the district court for offense level purposes).

The government responds that the court's restitution order was supported by the evidence, and reasserts its argument that the district court was authorized to (but did not) hold Huff responsible for a greater amount—the value of all the orders that he and Harper processed through S&G and for Deason's acts. The government argues that Vaghela is inapposite because, in that case, the victim was not substantially defrauded, whereas RAFB was substantially defrauded by the fraudulent orders processed through S&G. Id. at 40-41.

This court reviews de novo the legality of a restitution order, and for clear error a factual finding regarding the specific amount of restitution. United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007) (citations omitted).

11

Huff was convicted of an offense against property: conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343.  Accordingly, the district court was obligated to order restitution under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  Here, there is no argument or evidence that the burden of calculating actual loss to RAFB outweighed the need to compensate the government, therefore the district court was obligated to order restitution.  18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (3); United States v. Dickerson, 370 F.3d 1330, 1335-36 (11th Cir. 2004).

Huff does not dispute that some amount of restitution is owed; the question is how much.   Under 18 U.S.C. § 3664, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court."  18 U.S.C. § 3664(f)(1)(A) (emphasis added).  A restitution award "must be based on the amount of loss actually caused by the defendant's conduct."  United States v. Liss, 265 F.3d 1220, 1231 (11th Cir. 2001) (emphasis added).  The government bears the burden of proving the amount of the loss.  Id. at 1231-32; 18 U.S.C. § 3664(e).  "[A]s part of its burden to prove a restitution amount, the government must deduct any value that a defendant's fraudulent scheme imparted to the victims."  United States v. Swanson, 483 F.3d 509, 515 (7th Cir. 2007).

Here, the district court ordered Huff to pay $86,938.03 in restitution—the

12

same amount as the loss amount the district court calculated for purposes of Huff's offense level. However, the amount of loss does not necessarily equal the amount of restitution to be paid because "[a] defendant's culpability will not always equal the victim's injury." United States v. Catherine, 55 F.3d 1462, 1465 (9th Cir. 1995); see also United States v. Simpson, 538 F.3d 459, 463-66 (6th Cir. 2008) (holding that district court may look to intended loss for loss amount but must base restitution amount on actual loss); United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008), cert. denied, 129 S. Ct. 2026 (Apr. 20, 2009) ("The calculation of loss under the Sentencing Guidelines. . . does not necessarily establish loss under the MVRA [for restitution]."); United States v. Germosen, 139 F.3d 120, 130 (2d Cir. 1998) ("Of course, an amount-of-loss calculation for purposes of sentencing does not always equal such a calculation for restitution."). This is because, inter alia,[4] the amount of loss (for purposes of offense level calculation) is either the actual or intended loss while the restitution amount must be the actual loss suffered by the victim. Compare U.S.S.G. § 2F1.1 Cmt. n.7(b) (amount of loss is the greater of the intended or actual loss) with 18 U.S.C. § 3663(b) (amount of loss is "actual loss" to victim). Thus, "[a] court could find that a defendant intended a

_____

[4] In addition, restitution may include prejudgment interest while the amount of loss cannot. Compare United States v. Smith, 944 F.2d 618, 626 (9th Cir. 1991) (applying the MVRA, 18 U.S.C. § 3663) with U.S.S.G. § 2F1.1 cmt. (n.7).

13

large amount of loss for sentencing purposes, but then order a much-reduced amount in restitution in light of the actual losses suffered by the victims." United States v. Allen, 529 F.3d 390, 396-97 (7th Cir. 2008).

The record currently before the court does not explain how the district court reached its restitution figure. While the determination of the restitution amount "is by nature an inexact science," United States v. Teehee, 893 F.2d 271, 274 (10th Cir. 1990), under the MVRA, the district court is directed to "engage in an expedient and reasonable determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." United States v. Gordon, 393 F.3d 1044, 1047 (9th Cir. 2004) (relying on legislative history of "nearly identical" Victim and Witness Protection Act, 18 U.S.C. § 3663, S. Rep. No. 97-532, at 31 (1982), reprinted in 1982 U.S.C.C.A.N 2515, 2537, for guidance in interpreting MVRA, 18 U.S.C § 3363A). The district court must explain its findings with sufficient clarity to enable this court to adequately perform its function on appellate review. See United States v. Gupta, 572 F.3d 878, 890-91 (11th Cir. 2009) (remanding for district court to determine the amount of restitution owed); accord United States v. McAlpine, 32 F.3d 484, 490-91 (10th Cir. 1994) (vacating restitution order and remanding for district court to make specific factual findings because record did not indicate how district court arrived

14

at the specific restitution figure such that the reviewing court "was unable to effectively review the court's findings, and [was] unable to determine if the findings represent the victims' losses).  We are unable to do so in this case due to the presence of two major points of ambiguity in the record.

First, the government presented evidence that not all of the orders placed by Huff were fraudulent.  Indeed, Huff placed some orders with APC and S&G that were filled as expected, but the fraudulent orders were ones that were placed but (a) only partially filled, (b) not filled at all, (c) filled with personal items intended for use by Deason, or (d) filled with another item.  It is undisputed that RAFB suffered some amount of loss due to its payments for orders that were never or only partially filled under the fraudulent scheme.  But the district court did not make specific factual findings on how it calculated the exact dollar amount of the victims' actual losses.  The government presented evidence of the total amount charged to the government credit cards during the time period of the scheme, but a portion of those charges were for goods that were ordered and actually provided and thus would not count towards the restitution calculation.  S.H. testified that the kickbacks S.H. and Huff pocketed were from the "profits" of the scheme.  It is unclear from the sentencing transcript whether the district court determined if the victim (RAFB) received any value from some of Huff's fraudulent orders that

15

formed the basis for his substantive wire fraud convictions or if those orders were ones in which no items were supplied and thus were pure "profit" as S.H. suggested.

These facts are significant because any value of the services or items received by the victim (RAFB) must be offset against the restitution order. In Vaghela, the defendant, who worked for a medical clinic, accepted bribes in exchange for sending the clinic's lab work to a particular laboratory. 169 F.3d at 731. The Department of Health and Human Services ultimately paid $50,420.02 for some of this lab work, and the defendant received $23,400 in bribes. Id. This court held that the district court erred in finding that the defendant should pay $50,420.02 in restitution because it appeared that the lab work performed had been medically necessary, and, as a result, the government received a valuable service in exchange for its payments to the lab. Id. at 736. Thus, this court held that the amount of restitution should be the amount the defendant received in bribes: $23,400. Id.

In this case, the district court must make specific factual findings of whether the victim suffered a loss and the amount of those actual losses. The court must determine whether any value has been rendered to the victim in the form of a service or product that should be offset against the restitution amount. As it

16

currently stands, the district court appeared to adopt the Presentence Investigation Report's ("PSR") recommendation on the restitution amount and did not make specific factual findings at the sentencing hearing as to how this amount was calculated. The failure to explicate its methodology leaves us in doubt of the propriety of the $86,938.03 restitution award.

Next, given the record currently before this court, it is also unclear whether the district court's restitution order of $86,938.03 was meant to include the $42,068.64 that was attributable to S.H.'s share of the kickbacks. Specifically, did the district court already account for this $42,068.64 (S.H.'s share of the kickbacks) in S.H.'s restitution order,[5] or did the district court intend that Huff share jointly and severally in S.H.'s obligation for this amount in addition to the kickbacks Huff himself received? This factual finding is significant because "[t]he proper amount of restitution is the amount wrongfully taken by the defendant." United States v. Allen, 529 F.3d 390, 396 (7th Cir. 2008) (citation omitted). Restitution is not intended to "provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their

_____

[5] The Presentence Investigation Report noted that the total amount of restitution owed to the United States Treasury for RAFB was $342,777. The PSR noted that the amount of restitution owed by Huff should be offset by the restitution ordered for the other co-conspirators: Deason, S.H., and J.H. It is unclear though whether the amount of restitution the district court ordered for S.H. included the $42,068.64 in kickbacks that S.H. retained.

17

losses." United States v. Arutunoff, 1 F.3d 1112, 1121 (10th Cir. 1993) (citing 18 U.S.C. § 3663(b)(1)).  Thus, if the district court has already accounted for that amount in its separate restitution order in S.H.'s criminal judgment and did not intend for the obligation to be jointly and severally shared by Huff, it would appear that its existing restitution order would provide a windfall to the victim, who would be compensated twice for S.H.'s share of the kickbacks—once by S.H.'s restitution order and once by Huff's.

Because the district court did not make specific factual findings of the victims' actual losses, as required by § 3664, we therefore are unable to determine whether the amount of restitution imposed by the district court exceeded the victims' actual losses.  Accordingly, we vacate the restitution order and remand for a limited resentencing on the sole issue of the amount of restitution.

**AFFIRMED IN PART, AND VACATED AND REMANDED IN PART.**