[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-13107
Non-Argument Calendar

_____

D.C. Docket No. 1:19-cr-00139-DHB-BKE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSEPH D. YOUNG,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(April 1, 2021)

Before ROSENBAUM, NEWSOM, and ANDERSON, Circuit Judges.

PER CURIAM:

Joseph Young, a retired U.S. Army colonel, pled guilty under a written plea agreement to violating 18 U.S.C. § 371 by conspiring to commit bribery, *see* 18 U.S.C. § 201(b)(1)(C), and to violate a conflict-of-interest statute, *see* 18 U.S.C. § 208(a). The district court sentenced Young to 60 months in prison and ordered restitution in the amount agreed to in the plea agreement. On appeal, Young argues that the district court erred when it did not order the government to recommend a sentence of 24 to 30 months, which he contends was an oral promise that was part of his plea agreement, and that the restitution order is unlawful because the government failed to provide a factual basis for the restitution amount. After careful review, we affirm.

## I.

In October 2019, the government charged Young by information with a single count of conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, arising out of a bribery and kickback scheme to steer government contracts to build and modernize the communications network at Fort Gordon, Georgia. According to the information, after retiring at the rank of colonel following a long military career, Young formed J.Y. & Associates, an IT professional and consulting services company, in 2008. Between 2008 and 2014, Young conspired with another retired colonel, Calvin Lawyer, and two active-duty colonels, Anthony Tyrone Roper and Anthony Williams, to award millions in U.S. Army contracts to

Lawyer's company, which used J.Y. & Associates as a subcontractor. During this time, Lawyer gave Roper $200,000 in bribes, and Young paid Williams's spouse more than $1.2 million in salary and other compensation for a "no-show" job.

Young waived indictment and pled guilty pursuant to a negotiated plea agreement. Among other terms, the plea agreement covered various matters related to sentencing. Paragraph 3 stated that Young faced a maximum possible sentence of "5 years' imprisonment, 3 years' supervised release, a $250,000 fine, such restitution as may be ordered by the Court, and forfeiture of all forfeitable assets." Paragraph 4, titled "No Promised Sentence," provided that "[n]o one has promised Defendant that the Court will impose any particular sentence or a sentence within any particular range," and that the court was not bound by any estimates or recommendations from the parties. Paragraph 5 covered the Sentencing Guidelines and explained how the court would use the guideline range in determining an appropriate sentence. And paragraph 6 addressed "Agreements Regarding Sentencing Guidelines," including noting that the government would agree to a full reduction for acceptance of responsibility if certain conditions were met. Importantly, however, the government did not promise to recommend any particular sentence to the district court.

The plea agreement also covered restitution, stating in paragraph 8(c) that "[t]he Court shall impose an order of restitution for the full loss caused by

3

Defendant's criminal conduct, which the parties agree totals $1,131,861.66." Finally, paragraph 12 contained an integration clause stating, "This agreement contains the entire agreement between the government and Defendant." Young, his counsel, and two prosecutors all signed the agreement.

During the plea colloquy, the district court covered important terms of the plea agreement, along with the rights Young was waiving by pleading guilty and the maximum penalties he faced. Young confirmed that he had reviewed the plea agreement carefully and did not have questions about it, and that he understood he had agreed to pay restitution in the amount of $1,131,861.66. Young also answered "no" when asked these two questions: (a) "Has anyone made any promise or given you any hope of benefit or prediction or prophecy or guarantee in order to get you to plead guilty in this case?"; and (b) "Other than what's in the Plea Agreement, has anybody given you any hope of any sort of benefit if you plead guilty?" After the government recited a factual basis for the offense, Young suggested there might be defenses he could raise at trial, but he agreed he was guilty as charged. The court accepted the guilty plea as knowingly and voluntarily made.

After the probation office prepared Young's presentence investigation report ("PSR"), Young obtained substitute counsel. Young's new counsel filed objections to the PSR, including its recommendation that Young pay just over $1.1 million in

restitution as set out in the plea agreement.  Defense counsel asserted that restitution was illegal because there was no actual loss to the U.S. Army.

Then, about a month before the sentencing hearing, Young filed a "Motion for Specific Performance" seeking an order requiring "the government to keep its oral promise to Col. Young and his former counsel to recommend a sentence of between 24 to 30 months."  Young claimed—with supporting exhibits—that he had been induced to plead guilty by assurances from his attorneys that the lead prosecutor had agreed to recommend a sentence of 24 to 30 months, which plea counsel represented was the "guideline range," if Young entered a guilty plea to the conspiracy charge before indictment.  Feeling "he had no choice but to accept the plea offer," Young did so.  But in December 2019, after pleading guilty, he learned that the guideline range was significantly higher—exceeding the statutory maximum sentence of 60 months—and that the prosecutor would not recommend a sentence of 24 to 30 months.  Young argued that the government had breached the plea agreement by reneging on its oral promise to recommend a favorable sentence, and he requested an evidentiary hearing.

The government filed a response opposing Young's request for specific performance.  The government asserted that based on the plain terms of the plea agreement, Young could not have reasonably believed that the government promised to recommend a particular sentence, and that even if an oral promise existed, it was

5

for a sentence within the guideline range. Young filed a reply largely restating prior arguments.

On the scheduled date of the sentencing hearing, the district court first addressed the motion for specific performance. After reviewing relevant case law from this Court, the court found that the plea agreement was not ambiguous with respect to the alleged oral promise. The court reasoned that the written plea agreement "is the agreement between the parties" and "speaks for itself within its four corners," and that it mentioned no promise by the government to recommend a sentence of 24 to 30 months, so "nothing more will be ingrafted upon it." As a result, the court declined to consider additional, extrinsic evidence related to the parties' plea negotiations, such as testimony from Young's former counsel.

Nevertheless, "for the purpose of seeking additional comfort in the ruling," the district court also considered "the existing record," which included the plea colloquy as well as exhibits submitted by the parties documenting communications between Young and his attorneys and between plea counsel and the government. The court noted that Young had answered unambiguously during the plea colloquy that no promises not contained in the plea agreement induced him to plead guilty. As for the exhibits, the court found that the prosecutor had made a "dead wrong" estimate to Young's attorneys of the guideline range (24 to 30 months), and that estimate "got leap-frogged somehow into this seemingly unalterable expectation in

6

the Young camp that he was guaranteed a recommendation" in that range.  But the court did not see anything in the record from the prosecutor "that would constitute a promise in the first place."  So in the court's view, matters "beyond the Plea Agreement" supported its ruling that the alleged oral promise was not part of the plea agreement.  Accordingly, the court denied the motion for specific performance.

The district court then proceeded with sentencing.  Young argued his objections to the PSR, including his objection that the restitution amount had no factual or legal basis.  The court overruled that objection, among others, finding that restitution was lawful "and, indeed, required by this Plea Agreement which is valid and which has been affirmed in every respect under oath by this Defendant."  The court elaborated that the "loss is a minimum of [$]1,136,861.66 because that is the amount that was paid by Mr. Young to Mrs. Williams."  After the court established a guideline range at the statutory maximum of 60 months (otherwise 87 to 108 months), Young requested a sentence "in the 24 to 30 months range," while the government requested a sentence of 60 months.  The court imposed a sentence of 60 months, consistent with the sentences received by Young's coconspirators, and ordered restitution in the amount of $1,131,861.66.

## II.

Young first argues that the government breached the plea agreement by reneging on an oral promise—to recommend a prison sentence of 24 to 30 months—

7

which induced his guilty plea.  We review *de novo* whether the government has breached a plea agreement.  *United States v. Al-Arian*, 514 F.3d 1184, 1191 (11th Cir. 2008).  "However, the district court's factual findings regarding the scope of the agreement will be set aside only if they are clearly erroneous."  *Id.*

The government is bound by its material promises that induce a defendant to plead guilty.  *United States v. Hunter*, 835 F.3d 1320, 1324 (11th Cir. 2016).  To determine whether the government has violated a plea agreement, we apply an "objective standard," deciding "whether the government's actions are inconsistent with what the defendant reasonably understood when he entered his guilty plea."  *In re Arnett*, 804 F.2d 1200, 1202–03 (11th Cir. 1986).  The inquiry is based on the written terms of the plea agreement, though we do not "read[] the agreement in a hyper-technical or rigidly literal manner."  *Hunter*, 835 F.3d at 1324; *see Al-Arian*, 514 F.3d at 1191; *United States v. Copeland*, 381 F.3d 1101, 1106 (11th Cir. 2004).

In examining the scope of the government's promises in a plea agreement, we first must decide whether the relevant language is ambiguous.  *Copeland*, 381 F.3d at 1106.  If it is, "we will consider extrinsic evidence of the parties' intent in arriving at an interpretation of the agreement's language," construing the agreement against the government and so as not to directly contradict an oral understanding reflected in the plea negotiations.  *See id.* at 1105–06.  But if the agreement is unambiguous, "we are limited to the unambiguous meaning of the language in the agreement."  *Id.*

8

at 1106; *see Raulerson v. United States*, 901 F.2d 1009, 1012 (11th Cir. 1990) (stating that "[t]he final memorialization of [the plea] negotiations best informs the court of the agreements the parties have reached," especially when the plea agreement contains an integration clause stating that it constitutes the entire agreement between the parties).

Young contends that this case is like *Hunter* and *Arnett*, where we ruled in favor of the defendant's interpretation of the plea agreement. *Hunter* involved a dispute over the interpretation of a provision in a plea agreement that permitted the government not to fulfill its written promise to recommend an acceptance-of-responsibility reduction in certain circumstances. *See* 835 F.3d at 1325. The government sought to evade its promise by arguing that the defendant's pre-plea conduct met one of the exceptions. *Id.* But we found that the government's interpretation of the exception would make its promise "illusory" because it knew of this conduct when it entered the plea agreement. *See id.* at 1326–27. We also reasoned that its interpretation was "inconsistent with the text," which more naturally referred to post-plea conduct. *Id.* at 1327–28.

*In Arnett*, the defendant's plea agreement provided for forfeiture of $3,000, but the government later sought to forfeit his farm. 804 F.2d at 1203. Based on evidence of a prior oral understanding between the parties, we concluded that the defendant could reasonably have perceived the written agreement "as limiting any

forfeitures to $3,000," even if the forfeiture provision "may have been inartfully drafted." *Id.* Despite the lack of an express prohibition on further forfeiture, we declined to accept "such a hyper-technical reading of the written agreement." *Id.* In view of the "background of the negotiations" and the need for a waiver of constitutional rights to be knowing and intentional, we rejected an "interpretation of the plea agreement which directly contradicts the oral understanding." *Id.* And while the defendant stated under oath that the written plea agreement contained all the government's promises and that no other understandings existed, we reasoned that these statements were consistent with his reasonable interpretation of the agreement. *Id.* at 1203–04.

Young's reliance on *Hunter* and *Arnett* is misplaced. In each case, the defendant's reasonable understanding of the plea agreement was grounded in the language of the agreement itself. The cases therefore presented a dispute about the parties' intent in agreeing to specific written terms—the exceptions provision in *Hunter* and the forfeiture provision in *Arnett*. In those circumstances, we have relied on the background of the negotiations to inform "the interpretation of the agreement's language," construing the language against the government and so as not to directly contradict an oral understanding reflected in the plea negotiations. *See Copeland*, 381 F.3d at 1105–06. But neither case permits courts to bind the government to oral promises without regard to the language of the plea agreement.

10

And, here, no language in the plea agreement could be construed to include the alleged oral promise. The plea agreement unambiguously did not require the government to recommend a particular sentence, even though the government agreed to take other specific actions with respect to sentencing. The agreement also contained an integration clause, stating that the written plea agreement "contains the entire agreement between the government and Defendant," which reinforces that it would not have been reasonable for a defendant in Young's position to believe that the government was legally bound by an oral promise not contained in the plea agreement. Because no reasonable construction of the plea agreement could include the alleged oral promise, neither *Hunter* nor *Arnett* is comparable to this case.

Instead, this case is more like *In re Grand Jury Proceedings (Perdue)*, 819 F.2d 984 (11th Cir. 1987). The defendant in that case appealed an order holding him in contempt for refusing a subpoena to testify before a grand jury, arguing that the government had agreed that, in exchange for his guilty plea and acceptance of a longer sentence, it would not require him to testify in other matters. *Id.* at 985–86. Although we acknowledged that the defendant's understanding was plausible and that it was "quite possible [he] was at least unintentionally misled by the government," we noted that the plea agreement itself "simply does not contain any mention of future testimony, whether voluntary or compelled." *Id.* at 986–87. Because the plea agreement was "unambiguous," and despite the "clear conflict in

11

the understanding of the plea agreement," we held that we could not "rewrite the agreement to include a bar on attempts by the government to compel testimony" from the defendant. *Id.*

Similarly, in this case, even assuming Young's understanding was plausible and that he was "at least unintentionally misled by the government," we cannot "rewrite the agreement" to include a promise by the government for a favorable sentence that simply was not included in the agreement. *See id.* While Young broadly criticizes the district court for failing to consider extrinsic evidence, the record is clear that the court did consider matters outside the plea agreement, including the plea colloquy and the documentary materials submitted by the parties. But it concluded that these materials were consistent with its ruling on the terms of the plea agreement and, in fact, showed that the prosecutor did not make the alleged oral promise "in the first place."

To the extent Young suggests intentional misconduct by the government, the district court found otherwise, and its finding is not clearly erroneous. *See Al-Arian*, 514 F.3d at 1191. To the extent Young believes the district court should have considered additional extrinsic evidence, such as plea counsel's testimony, or held formal evidentiary hearing, he has abandoned any challenge along those lines by failing to raise those issues plainly and prominently on appeal. *See United States v. Jernigan*, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003) (stating that "a party seeking to

12

raise a claim or issue on appeal must plainly and prominently so indicate" by, at the very least, "devot[ing] a discrete, substantial portion of his argumentation to that issue"). His general assertion that the court failed to consider extrinsic evidence is not enough.

For these reasons, Young has not shown that he "reasonably understood" the government's alleged oral promise to recommend a particular sentence to be part of the plea agreement when he entered his guilty plea. *See In re Arnett*, 804 F.2d at 1202–03. Accordingly, we affirm Young's 60-month sentence.

### III.

We review the legality of a restitution order *de novo* and the underlying factual findings, including the amount of restitution, for clear error. *United States v. Baldwin*, 774 F.3d 711, 728 (11th Cir. 2014); *United States v. Huff*, 609 F.3d 1240, 1247 (11th Cir. 2010).

The parties agree that the district court ordered restitution under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A. The MVRA makes restitution mandatory, without regard to the defendant's ability to pay, to the victims of certain offenses. *See* 18 U.S.C. § 3663A(a)(1), (c)(1). Young does not dispute that he has a qualifying offense under the MVRA; he argues only that the

amount of restitution ordered, in accordance with the plea agreement, lacked any factual support in the record.[1]

"The amount of restitution must be based on the amount of loss actually caused by the defendant's conduct," which the government must prove by a preponderance of the evidence. *Baldwin*, 774 F.3d at 728 (quotation marks omitted). Thus, loss for purposes of the guidelines, which may be based on actual or intended loss, "does not necessarily equal the amount of restitution to be paid because a defendant's culpability will not always equal the victim's injury." *Hoff*, 609 F.3d at 1247 (brackets and quotation marks omitted). "Because the determination of the restitution amount is by nature an inexact science, where difficulties arise, a district court may accept a reasonable estimate of the loss based on the evidence presented." *Baldwin*, 774 F.3d at 728 (citation and quotation marks omitted).

Here, the district court's determination of the restitution amount owed by Young was not clearly erroneous. Admittedly, the factual record is sparse. The restitution amount was based on the undisputed amount Young paid in bribes to an active-duty colonel, Williams, in return for steering millions of dollars' worth of government contracts to J.Y. & Associates, Young's company. These bribes were

---

[1] The government does not rely on a provision of the similar Victim and Witness Protection Act, 18 U.S.C. § 3663(a)(3), which states: "The court may also order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." Nor does it dispute Young's assertion that the record must contain an adequate factual basis for the restitution award, notwithstanding Young's assent to a specific restitution amount in the plea agreement.

paid to Williams's spouse in the form of salary and other compensation for a "no-show" job.

On their face, these facts do not clearly show how the bribes caused actual loss to the government. For instance, the record does not contain any details about how the contracts were structured—such as whether J.Y. & Associates independently billed the government for the no-show job or whether the contract was simply for certain services at a fixed price—or whether the bribe payments made any appreciable difference to the services the government paid for.

However, Young himself had access to this information, and he admitted in the plea agreement that "the full loss caused by [his] criminal conduct" was $1,131,861.66. The district court was permitted to rely on this factual admission—which contributed to the record's relative scarcity on the restitution issue—and the reasonable inferences that could be drawn from it. *See United States v. Martinez*, 584 F.3d 1022, 1027 (11th Cir. 2009) ("A fact admitted to during a guilty plea cannot later be contested when it appears in the defendant's [presentence investigation report]."). And combined with the other facts Young admitted during the guilty plea and in the undisputed facts set forth in the PSR, we think it provided a sufficient factual basis for the district court to conclude that Young's bribe payments to Williams's wife caused actual loss to the government in the amount specified in the plea agreement.

For these reasons, we affirm the restitution order as well.

**AFFIRMED.**