**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 23-12101

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

ABDOULAYE BARRY,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cr-00385-ELR-JSA-5

————————————

Before WILLIAM PRYOR, Chief Judge, and GRANT and KIDD, Circuit Judges.

KIDD, Circuit Judge:

Abdoulaye Barry and his codefendants used shared stolen credit cards and shared memberships at a popular warehouse store to purchase large amounts of cigarettes. As a result, they were

charged with several fraud offenses. Barry alone went to trial, and a jury convicted him of a subset of the offenses. At sentencing, the district court held Barry accountable for the total amount that he and his codefendants charged on the shared credit cards without first determining the amount for which Barry himself should be responsible. That was a legal error. So we vacate Barry's sentence and remand the case to the district court for resentencing.

## I.    BACKGROUND

Barry and his codefendants used stolen credit cards to purchase over $2 million in cigarettes from Sam's Club, a membership-based warehouse. Here is how the scheme worked:

Sam's Club requires a personal or business membership to shop in its stores. The coconspirators in this case opened business memberships. For that type of membership, the person who opens the account is the primary cardholder and the only person who can make changes to the account. The primary cardholder can add secondary members to the account. A business membership requires both photo identification and a government-issued business license. During the relevant timeframe, the Sam's Club membership card included a photograph of the member, which was taken in the store.

The coconspirators obtained Sam's Club memberships in their names and aliases, and they sometimes provided fraudulent tobacco licenses to do so. They then used the memberships and stolen credit cards to buy cigarettes in large quantities.

Barry was the primary account holder on two business membership accounts, one for Enclave One Stop Shop and one for Suwannee Smoke Shop. One codefendant also used the Enclave One Stop Shop account, three codefendants used the Suwanee Smoke Shop account, and one of those three was issued a membership card for Suwanee Smoke Shop. Barry was a secondary member on two other business accounts, which were for Sawalii Smart Shop and Dominic Tobacco Shop. Three codefendants used the Sawalii Smart Shop account, and three codefendants used the Dominic Tobacco Shop account. Additionally, Barry used stolen credit cards that were also used by other codefendants.

Barry and his codefendants faced an 85-count indictment in the district court. Count 1 alleged that the group conspired to commit credit card fraud, in violation of 18 U.S.C. § 1029(a)(2) and (b)(2). Barry was also charged individually with six counts of credit card fraud (Counts 62–67), in violation of 18 U.S.C. §§ 1029(a)(2) and 2, and six counts of aggravated identity theft (Counts 68–73), in violation of 18 U.S.C. §§ 1028A(a)(1) and 2. The government alleged that Barry used six victims' credit cards, and each of the six pairs of credit card fraud and aggravated identity theft charges corresponded to each victim.

After Barry's codefendants pleaded guilty, Barry proceeded to trial, which lasted four days. The government called five of the six victims to testify at trial to establish that they had not made or authorized the purchases at issue on their credit cards.

After the government rested its case, the district court granted Barry's motion for a judgment of acquittal as to Counts 64 and 70 because the alleged victim, G.L., did not testify and there was no other evidence that Barry's use of the associated card was unauthorized. Subsequently, the jury also acquitted Barry of Counts 62 and 68, associated with alleged victim S.M. The jury found Barry guilty of the remaining charges.

Prior to sentencing, a probation officer prepared a presentence investigation report. The probation officer calculated the loss amount as $539,131.79, which included losses caused by Barry's codefendants using the same stolen credit cards as Barry. The probation officer excluded from the loss amount transactions involving the use of S.M.'s and G.L.'s cards because Barry was acquitted of the charges associated with those cards.

Barry objected to this loss calculation. At sentencing, the district court heard argument from the parties regarding the loss amount. The government argued for a loss amount in the $550,000–$1,500,000 range of the Sentencing Guidelines, or alternatively, in the $250,000–$550,000 range. Barry argued that his loss amount should be restricted to the transactions that he personally made, which amounted to $117,261.98. Barry conceded that he was in a conspiracy and that he was working with someone else, but he contended that the government had not produced "any evidence to show that [he] should have been aware that these other people were using the same cards as him."

The district court stated the following when announcing the decision on the loss amount:

> I also overrule or reject the defendant's objection that he should essentially only be held accountable for the count reflecting his own conduct, because I do find that the government did prove a conspiracy existed and the jury obviously did agree to that.
>
> So I find that, in this case, conspiracy, which I find equates to jointly undertaking criminal activity, leads us to the conclusion that probation has reached, which I agree with, and that is that 12 is the correct number of levels to add for loss.

Therefore, the district court determined that the loss amount that the probation officer calculated was correct.

The district court ultimately imposed a sentence of 69 months of imprisonment but left open the amount of restitution. Barry then appealed his judgment. Subsequently, the district court ordered Barry to pay restitution in the amount of $539,131.79—the total disputed loss amount.

## II.    STANDARD OF REVIEW

We review questions of law arising under the Sentencing Guidelines de novo. *United States v. Huff*, 609 F.3d 1240, 1245 (11th Cir. 2010). We review "for clear error a factual finding regarding the specific amount of restitution." *Huff*, 609 F.3d at 1247.

## III.    DISCUSSION

### A.  Loss Amount

The district court did not determine the loss amount attributable to Barry individually, and the parties agree that this failure was in error. The Sentencing Guidelines require a defendant to be held accountable for all acts that he "committed, aided, abetted . . . or willfully caused." U.S.S.G. § 1B1.3(a)(1)(A) (Nov. 2021). In cases involving joint criminal activity, a defendant may also be held accountable for the conduct of others, but only if that conduct was (1) "within the scope of the jointly undertaken criminal activity," (2) "in furtherance of that criminal activity," and (3) "reasonably foreseeable in connection with that criminal activity." *Id.* § 1B1.3(a)(1)(B)(i)–(iii). Thus, "a district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-conspirators in furtherance of the conspiracy." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (citation modified).

But "to determine a defendant's liability for the acts of others, the district court must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant." *Id.* (citation omitted); *see* U.S.S.G. § 1B1.3, cmt. (n. 3(B)). The district court thus committed a legal error when it concluded that "conspiracy . . . equates to jointly undertaking criminal activity" and then failed to make individualized findings. This is because the scope of the defendant's jointly undertaken activity is not necessarily the same as the scope of the entire conspiracy, so the

relevant conduct for each coconspirator likewise is not necessarily the same. U.S.S.G. § 1B1.3, cmt. (n. 3(B)).

Our precedents illustrate why this is reversible error. For instance, in *United States v. Medina*, one of the defendants who received kickbacks from a healthcare fraud scheme challenged the calculation of her loss amount at sentencing, which included every claim the conspirators had submitted to Medicare. 485 F.3d 1291, 1303 (11th Cir. 2007). We sent the case back for resentencing because we could not determine the factual basis for holding the defendant responsible for every claim submitted to Medicare during the conspiracy. *Id.* at 1304–05.

Similarly, in *United States v. Hunter*, the defendants challenged the district court's loss calculation for their convictions stemming from a counterfeit-check conspiracy. 323 F.3d 1314, 1316 (11th Cir. 2003). The district court found at sentencing that "a ring" existed and that it would not be "unusual that the various participants in the ring would not necessarily know one another." *Id.* at 1318. But the district court also found that it was "certainly reasonably foreseeable they would be aware of the fact they were participating in a larger scheme than their own individual conduct," and it held the defendants responsible for the larger amount of the conspiracy. *Id.* We determined that the district court erred in assessing the defendants' relevant conduct. *Id.* at 1320. Although the district court found that the conduct was reasonably foreseeable, it did not first identify the scope of the activity the defendants agreed to

jointly undertake. *Id.* "Only after the district court makes individualized findings concerning the scope of criminal activity the defendant undertook is the court to determine reasonable foreseeability." *Id.* We vacated the sentence and remanded the case for particularized findings about the scope of the defendants' agreement to participate in the fraudulent scheme and for resentencing. *Id.* at 1323–24.

The rule is that a sentencing judge must make individualized findings. "[W]ithout individualized findings concerning the scope of [the defendant's] involvement with the conspiracy, it cannot be determined that [he] should be liable for some quantity less than all." *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993). But we recognize that we have also held that "a sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record supports the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002) (citation modified); *see also Pierre*, 825 F.3d 1183, 1198 (11th Cir. 2016) (holding that regardless of whether the district court made individualized findings, the record supported the court's determinations); *Mateos*, 623 F.3d at 1370–71 (finding that the record clearly supported the district court's determination to hold the defendant responsible for the entire loss amount). In each of these cases, we found that the record clearly supported holding each of the defendants accountable for the loss amounts at issue.

Not so here. After careful review, we determine that the record contains insufficient evidence for us to find that Barry necessarily should be liable for the conspiracy's entire loss amount.

The evidence at trial showed that opening a business membership account at Sam's Club required a customer to go into the store with a photo identification and business license. The person who opens the account is the primary cardholder and the only person who can add a secondary member to the account by bringing that person into the Sam's Club store. Barry was a primary account holder for two business memberships.

The government presented evidence that several of Barry's coconspirators *used* these two accounts, but the evidence established only that one coconspirator was a *member* of those accounts. So there is insufficient evidence to allow us to infer that Barry, as the primary account holder, necessarily accompanied the remaining coconspirators to the Sam's Club store to be added as secondary members to his accounts. Because of that deficiency, the government failed to tie these codefendants in time or place to Barry. Similarly, while Barry had two secondary membership accounts, he would have had to go with only the primary account holder to be added to those accounts. The evidence does not establish that he should have known of other secondary members or other users of the accounts.

The government also failed to connect all of the credit card charges to Barry. At trial, the government established that Barry and his codefendants used the same stolen credit cards, sometimes

within one day of each other. But we cannot reasonably infer from shared usage that Barry knew about the other users and what they were doing with the cards. While the evidence shows that Barry was passing credit cards to *someone*, it does not reveal who that someone was.

Our dissenting colleague reads these facts differently and believes that we must "[go] along with [Barry's] narrative" about someone named "John" to "reject as clearly erroneous the district court's factual finding that Barry and his codefendants jointly undertook the scheme." First, as we note above, the district court committed a legal error by equating "jointly undertaken criminal activity" with the scope of the entire conspiracy. The dissent attempts to rehabilitate this error by interpreting the district court's statement to say that, "in this case," the district court viewed the two as being coterminous. The dissent then asserts that this interpretation was a factual finding that we should review for clear error. We disagree with the dissent's interpretation. The district court's statement that "conspiracy, *which I find equates to* jointly undertaking criminal activity" (emphasis added) is simple to understand—and legally incorrect. That the district court used the word "find" when committing this error does not convert the legal conclusion into a factual finding.

After converting the district court's conclusion, the dissent goes on to make the individualized findings that it admits the district court, erroneously, did not make—even though the parties

discussed the conspiratorial acts at sentencing. In making its findings, the dissent appears to draw inferences in favor of the government rather than "[go] along with [Barry's] narrative." Yet it is not Barry's burden to prove loss amount. *Medina*, 485 F.3d at 1304 ("The amount of loss must be proven [by the government] by a preponderance of the evidence, and the burden must be satisfied with reliable and specific evidence" (citation modified)). Regardless of what role "John" might have played in this scheme, to uphold the district court's sentence, we would have to find that the government connected Barry to each person and each credit card charge in the conspiracy with reliable and specific evidence. We cannot make that finding on the evidence presented, so we will leave any such determination to the district court on remand.

In summary, the district court concluded that Barry was responsible for all the losses caused by his coconspirators without considering whether those losses fell within the scope of the jointly undertaken criminal activity that was reasonably foreseeable to him. That conclusion was erroneous, so we vacate Barry's sentence and remand the case to the district court for resentencing. On remand, the district court will have the opportunity to make individualized findings regarding the scope of the criminal activity that Barry undertook, and only after doing so, what conspiratorial conduct was reasonably foreseeable to Barry.

### B.  Restitution

The district court also ordered Barry and his codefendants jointly to pay $539,131.79 in restitution. Barry argues that his ordered restitution should match his individual loss amount. Indeed, the measure of restitution is each victim's loss proximately caused by the defendant. *See United States v. Martin*, 803 F.3d 581, 593–94 (11th Cir. 2015). On remand, the district court should also reconsider Barry's restitution amount.

### C.  Clerical Error in the Criminal Judgment

Finally, there is a clerical error in Barry's judgment, which this Court may raise sua sponte and remand with instructions to correct it. *United States v. Massey*, 443 F.3d 814, 822 (11th Cir. 2006). The judgment states that, for Counts 71, 72, and 73, Barry was convicted of violating 18 U.S.C. §§ 1028(a)(1) and (2). But that is the wrong statute. The aggravated identity theft statute is 18 U.S.C. § 1028A, not 1028(a). Therefore, on remand, the district court is directed to enter an amended judgment that corrects this clerical error.

## IV.    CONCLUSION

We **VACATE** Barry's sentence and **REMAND** to the district court for resentencing in accordance with this opinion, as well as to correct the clerical error in Barry's judgment.

23-12101                    GRANT, J., Dissenting                    1

GRANT, Circuit Judge, dissenting:

I respectfully disagree with the majority's decision to remand the case to the district court for resentencing. In my view, the district judge made a factual finding that Barry and his coconspirators embarked on a joint scheme to lie and steal, and it did not clearly err in holding Barry responsible for the damage done by his partners in crime.

"Whether a co-conspirator's act was reasonably foreseeable to the defendant so that it qualifies as relevant conduct is a question of fact reviewed for clear error." *United States v. Valarezo-Orobio*, 635 F.3d 1261, 1264 (11th Cir. 2011). And under clear error review, the Court should affirm the sentence so long as it is "plausible in light of the record viewed in its entirety" that the conduct at issue was "part of the same common scheme or plan." *United States v. Siegelman*, 786 F.3d 1322, 1333 (11th Cir. 2015) (quotation omitted).

I agree with the majority that the district court's statement on this question "is simple to understand." Majority Op. at 10. But it is simpler still when one considers the complete quotation rather than a partial one: "I *find* that, *in this case*, conspiracy, which I *find* equates to jointly undertaking criminal activity, leads us to the conclusion that" Barry is responsible for a higher loss amount. Sentencing Tr. at 34 (emphasis added); *see* Majority Op. at 6. So while the scope of "jointly undertaken criminal activity" will not always be the same as the scope of an entire conspiracy, here the district court made a factual finding that in this case, the two were

2                        GRANT, J., Dissenting                    23-12101

coextensive.   *See* U.S. Sentencing Guidelines § 1B1.3 cmt. n.3(B) (Nov. 2021).

Refusing to accept this factual finding for what it is, the majority insists that the district court committed "legal error" by equating—as a matter of law—jointly undertaken criminal activity and conspiracy.  Majority Op. at 6–7, 10.  Not so.  Indeed, "the record from the entire sentencing hearing" contradicts this surprising assertion.  *See United States v. Suarez*, 939 F.2d 929, 934 (11th Cir. 1991).  To start, the presentence investigation report teed up the "unresolved factual issue" of whether Barry and his codefendants jointly undertook the scheme.  And at the very beginning of the sentencing hearing, the district court asked the parties to present any objections to the "factual findings" underlying the probation officer's Guidelines range calculation. Sentencing Tr. at 5.  On the question of loss amount, both sides went great lengths to highlight the evidence that supported their view of the facts—including surveillance images, Sam's Club records, and witness testimony from Barry and others.  *See id.* at 8–34.  Against this backdrop, the district court adopted the probation officer's findings on this "unresolved factual issue."

The majority's characterization of the district court's relevant conduct determination as a legal conclusion about *all* conspiracies, rather than a factual finding about *this* conspiracy, is also implausible because Barry did not object on those grounds at the sentencing hearing.  In fact, Barry concedes on appeal that "the district court's error in failing to make individualized findings as to

23-12101                GRANT, J., Dissenting                3

loss can be overcome if the trial evidence supports its calculation." So the record reflects, and the parties agree, that the district court made a factual conclusion that in this case the jointly undertaken activity was the same as the conspiracy writ large. That conclusion must therefore be reviewed for clear error.

That high standard is not met here. The facts do not show a sprawling conspiracy with many moving parts; it was a petty get-rich-quick scheme in which a crew used the same set of fake Sam's Club memberships and stolen credit cards to buy untaxed cigarettes. The scope of the criminal activity goes no further than that, and the district court did not clearly err by concluding that Barry and his coconspirators jointly undertook that scheme.

No doubt—the sentencing court should have made individualized findings about the scope of the activity that the defendant and his coconspirators jointly agreed to undertake. *See United States v. Hunter*, 323 F.3d 1314, 1320 (11th Cir. 2003). But as the majority opinion recognizes, "a sentencing court's failure to make individualized findings regarding the scope of the defendant's activity is not grounds for vacating a sentence if the record support[s] the court's determination with respect to the offense conduct, including the imputation of others' unlawful acts to the defendant." *United States v. Petrie*, 302 F.3d 1280, 1290 (11th Cir. 2002). So it is settled law: the absence of individualized findings from the district court does not mean the sentence is vacated. It means that *we* must evaluate the offense conduct determination based on *our* view of the record evidence to decide whether the

4                    GRANT, J., Dissenting                    23-12101

district court's conclusion was clearly erroneous.[1] *See United States v. Moriarty*, 429 F.3d 1012, 1021–22 (11th Cir. 2005); *United States v. Baldwin*, 774 F.3d 711, 730–31 (11th Cir. 2014).

It was not.  There was plenty of evidence for a reasonable factfinder to infer that Barry knew what his coconspirators were up to, and that they were all in on it together.  To begin with, the scheme was profitable precisely because it could operate at scale: one fake tobacco license could support one fake primary business membership; one fake primary membership could support up to ten fake secondary memberships.  Because Barry and his coconspirators got their hands on many fake licenses, there were lots of memberships to go around—each providing access to a nondepletable supply of cheap cigarettes.  And while cheap is good, free is better.  The evidence also shows that Barry and his coconspirators used the same set of stolen credit cards to make their tobacco purchases.

For his part, Barry played an outsized role in the scheme, and the evidence reveals a web of connections.  He was the primary account holder for two fake businesses: "Enclave One Stop Shop" and "Suwannee Smoke Shop."  Codefendants Ousmane Diallo, Alimu Bah, and Sayon Bestman all used Barry's primary accounts. Diallo even joined one of those accounts as a secondary member. Because Sam's Club requires the primary account holder to

---

[1] For that reason, the majority's critique that my clear error analysis depends on factual findings that the district court did not make falls flat.  Majority Op. at 10–11.

23-12101                GRANT, J., Dissenting                5

accompany the secondary membership applicant, Diallo's secondary membership ties Barry and Diallo to the same time and place. The district court could easily have inferred that by allowing Diallo, Bah, and Bestman to use memberships associated with his primary account, Barry knew that these codefendants would become coconspirators. It was not just foreseeable—it was the entire point of the scheme.

Codefendants Thierno Ly and Thierno Bah did not use memberships associated with Barry's primary accounts, but that does not mean there were no ties. To the contrary, Ly, Bah, and Barry all used secondary memberships belonging to the same primary accounts: "Dominic Tobacco Shop" for Ly and Barry, and "Sawalii Smart Shop" for all three men. Plus, all three used the same set of stolen credit cards. Here too, the logical inference is that Barry knew that Ly and Bah were his partners in the scheme.

The majority sees the record differently. It concludes that the government did not present enough evidence to show that Barry would or should have known that his codefendants were also part of his scam—never mind that they used the same kind of memberships to buy the same kind of products with the same stolen credit cards, often on the same day and at the same location. Majority Op. at 9–11. To be fair, Barry did offer a way around the obvious inferences. As he explained it at trial, someone named "John" operated the scheme as a hub-and-spoke, personally providing him with fake business documents and stolen credit cards before each purchase, and then collecting them right after.

According to Barry, this "John" character would then hand them over to the next participant in the scheme—but Barry himself never took part in that transfer. All the while, he insisted, John kept him and his codefendants in the dark about what the others were doing.

If Barry's story is true, then the obvious inferences from the evidence presented at trial—all pointing to a joint undertaking between Barry and his codefendants—would be disproved. But the district court did not buy it, and I can see why.

*First*, Barry could not provide basic details about his alleged boss. He even said he did not remember John's last name, a curious assertion since he also claimed that he often purchased cigarettes with business memberships and credit cards bearing that name.

*Second*, Barry said he did not know how to get in touch with John—even though John supposedly pulled all the strings and would give him "eight to nine thousand dollars at a time in cash" to buy cigarettes. How did he know when to meet John in the parking lot? Barry did not say.

*Third*, in Barry's telling, John paid him to do the dirty work because it would have been suspicious for John to visit Sam's Club more than once. But this part of the story has serious holes in it too: if John had a Sam's Club business membership based on a retail tobacco license, it would have been no more suspicious for him to make frequent trips to buy cigarettes in bulk than it would have been for Barry. Indeed, consistent with Sam's Club policy allowing members to "come in and shop the club as many times as [they]

23-12101                 GRANT, J., Dissenting                 7

like throughout the year," Barry testified that he made multiple trips, often on the same day and often only a few minutes apart. Yet he never explained why John needed him to serve as a middleman, or why it seemed less suspicious for Barry to use an account bearing someone else's name to make large repeat purchases.

*Fourth*, Sam's Club records show that Barry and his coconspirators often shopped at the same stores on the same day, sometimes within minutes of each other and swiping the same stolen credit cards. For example, on the night of October 30, 2019, Barry went shopping with Diallo at the Sam's Club in Duluth: Barry made two back-to-back purchases totaling $7,157 on a stolen Capital One credit card; and seven minutes later, Diallo completed a $5,371 transaction. Thierno Bah joined the crew two days later at the Sam's Club in Alpharetta. Around noon, Bah made a $9,054 purchase with the same stolen Capitol One credit card that Barry used just a few days earlier in Duluth. Barry followed up four minutes later with a $7,271 transaction. And just 45 minutes after that, Diallo charged $2,674 to the stolen Capitol One credit card that Bah used less than an hour earlier.

It's no coincidence that the three men stood in the same checkout line and swiped the same set of stolen credit cards. And it's no coincidence that police apprehended Diallo inside Barry's car not long after. Unable to account for abundant record evidence tying him to his business partners, Barry's fiction about "John" rests

on a thoroughly "unimpressive account of events." *United States v. Rivera*, 780 F.3d 1084, 1098 (11th Cir. 2015).

Barry's story simply does not add up. But unless this Court goes along with his narrative, I cannot see why we would reject as clearly erroneous the district court's factual finding that Barry and his codefendants jointly undertook the scheme. Inferences like the ones above "are a staple of our adversary system of factfinding." *Cnty. Ct. of Ulster Cnty. v. Allen*, 442 U.S. 140, 156 (1979). Evidence is evidence. And whether it is "reliable and specific" does not turn on whether it proves a fact directly or by way of inference. Majority Op. at 11.

In short, that some of the evidence here is circumstantial does not excuse the majority's failure to consider it. Clear error review is deferential and "imposes an especially heavy burden on the appellant." *Lincoln v. Bd. of Regents of Univ. Sys. of Ga.*, 697 F.2d 928, 939 (11th Cir. 1983). After all, "the district court had the advantage of observing the witnesses and evaluating their credibility firsthand." *Id*. Barry does not come close to showing reversible error by the district court, and I respectfully dissent.